ESTATE of John R. TASCHLER, Deceased, by Dorothy Taschler, Executrix, and Dorothy Taschler, Appellants,

v.

UNITED STATES of America.

Nos. 18769–18771.

United States Court of Appeals, Third Circuit.

Argued Jan. 8, 1971.

Decided March 29, 1971.

William C. McClure, Pittsburgh, Pa. (Robert G. MacAlister, Frank E. Coho, Pittsburgh, Pa., on the brief), for appellants.

Gary R. Allen, Department of Justice, Tax Division, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Elmer J. Kelsey, Attys., Department of Justice, Washington, D. C., Richard L. Thornburgh, U. S. Atty., on the brief), for appellee.

Before GANEY and ADAMS, Circuit Judges, and WEIS, District Judge.

## OPINION OF THE COURT

GANEY, Circuit Judge.

The appeals in these three consolidated actions pose the recurring issue whether *sums withdrawn from a corporation by a taxpayer owning all of its common stock were dividends to be taxed, as ordinary income, or loans, the total of which could be treated as long-term capital gains upon the sale of the corporation.* The district court found that they were dividends rather than loans for the taxable years 1958, 1961 and 1962, and ordered judgment be entered in favor of the United States in each of the actions for refunds of taxes and interest on be-

half of the taxpayer's estate, and by the taxpayer's widow.[1]

During the year 1957, through July 15, 1963, the taxpayer, John R. Taschler, was employed as president of Down-State Finance Corporation, a small loan (up to $600) company, with its office and principal place of business in Bradford, Pennsylvania. From the time it was organized until it was sold, the taxpayer received annually from Down-State the following salaries paid on a monthly basis: 1957, $19,980; 1958, $21,980; 1959, $22,980; 1960, $19,860; 1961, $14,400; 1962, $14,400 and 1963, $6,600. They totaled $100,220 and averaged about $1,200 a month. The taxpayer, at his discretion within limits, fixed the amount of his salary and the time of its receipt.

Beginning in late 1958, the small loans business began to fall off and the taxpayer sought to make investments elsewhere. During the five and one-half years from the end of 1957, through July 15, 1963, the following amounts totaling $102,000 were advanced in twenty-three payments of between $500 and $24,000 to the taxpayer at his request for his personal use from Down-State: 1958, $27,000; 1959, $13,000; 1960, $10,000; 1961, $10,000; 1962, $17,000 and 1963, $16,500. For 1963 and the three years involved, they totaled $70,500. These payments approximated $1,500 a month. Each time, with a few exceptions, when the taxpayer would request informally the office manager of Down-State to forward him a check drawn on Down-State for one of the twenty-three disbursements, he would send him a signed unsecured demand note for the total amount withdrawn up to that time, and the previous note was either destroyed or returned to the taxpayer.[2] But for a $5,000 payment in 1959, a year not involved here except for evidentiary matters, the taxpayer never paid Down-State any sum of money to offset the total amount withdrawn. However, the amount of his monthly salary check was reduced by a sum equal to the monthly charge of the rate at one-half of one percent on the total amount withdrawn up to that time. A notation of this amount was made in the records of Down-State under the heading "Memorandum of loans, interest repayments, etc." During the same period in which the above withdrawals were made, no formal dividends were paid by Down-State on its common stock.[3] A dividend of $2,349 was paid in 1957.

For some years the taxpayer had contemplated selling Down-State, and on July 15, 1963, he sold his common stock in that corporation to Carson Finance Company for $100,000. Upon the completion of the sale, his demand note to the corporation for $97,000 ($102,000 minus $5,000) was marked paid by Down-State's officer manager and returned to the taxpayer. He died less than a month later on August 6, 1963. The income tax return for 1963 filed on behalf of taxpayer's estate listed the sales price of Down-State as being $197,000 ($100,000 plus the face amount of taxpayer's demand note) and after the original cost ($78,000) and other expenses were subtracted from the sales price, treated the gain, for income tax purposes, as a long-term capital gain. In 1965, Internal Revenue Service audited the 1963 tax return and also those filed by the taxpayer for the years 1958, 1961 and 1962. The years 1959 and 1960 were not available for auditing. The Service reduced the capital gain figure of the 1963 return by $70,500, the total of the amounts advanced to him as loans by Down-State in 1958, 1961, 1962 and

---

1. Taxpayer's widow is a party to these proceedings solely because she had filed joint returns with the taxpayer.

2. A certified public accountant who was the tax accountant for both Down-State and the taxpayer, individually, and who prepared their tax returns during all the years in question, testified that he did not know about the note or notes given by the taxpayer until after Down-State was sold. (Transcript of Testimony, pp. 152–153.)

3. A seven percent dividend of $700 was paid semi-annually on the preferred stock which was not held by the taxpayer.

1963, and entered as dividend income on taxpayer's returns for each of the years 1958, 1961 and 1962, and also the 1963 return filed on behalf of his estate the amount received by him in each of those years. Taxpayer's estate paid the increased tax assessment[4] of $7,875.-13, plus interest of $4,947.22, for the years 1958, 1961 and 1962, and brought three separate actions for refunds, one for each of those years.

The district court found from the circumstances surrounding the payments that the taxpayer never intended to actually repay any part of the $97,000 withdrawn from Down-State. The court's findings, unless clearly erroneous, may not be set aside. Rule 52(a) of the Federal Rules of Civil Procedure; Commissioner of Internal Revenue v. Duberstine, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

The estate claims the findings were erroneous on a number of grounds. One is that the "debt" of $97,000 was repaid when Down-State was sold, and this was long before the "investigation" of taxpayer's previous tax returns occurred. Repayment of funds received is an important factor in determining whether those funds were loans. The contention here begs the question. Whether the amount was repaid depends on whether the amounts paid the taxpayer during the six and one-half years were in fact loans. This Court in C. I. R. v. Makransky, 321 F.2d 598, 600 (C.A.3, 1963), stated:

> "While in many cases various factors must be weighed in determining for income tax purposes the true character of a purported loan, there is one essential without which a transaction cannot be recognized as a loan.

The parties must have entered into the transaction with the intention that the money advanced be repaid."[5] (Cited authorities omitted.)

The district court found that: "The evidence in the cases clearly shows that Mr. Taschler handled the corporate funds as his own and withdrew sums at will as needed by him with no real intention of even repaying the monies to the corporation." The evidence produced at a trial to the court sitting without a jury supports the court's finding on this vital issue.

With the exception of the day-to-day routine small loan transactions, taxpayer was in complete control of Down-State. He decided when the notes of small loan customers should be assigned to other lending institutions for loans. In a letter to the Service dated September 28, 1959, the taxpayer admitted: "Inasmuch as I am owner of Down-State Finance Corp., I utilize the money in that Corporation for my own personal use when necessary. As you will note, I paid off my mortgage loan and personal loan of $15,000 to Producers Bank & Trust Co., through a loan acquired from them August 30th, 1958." He instructed the office manager of Down-State to permit taxpayer's personal friends to receive loans in excess of the $600 maximum. Dan White borrowed $10,000, Andy George $1,500, and Dan's Auto Mart, in which he held a half interest, $6,000. All of these were without collateral, and the last one mentioned was without a note. Additionally, Down-State purchased a $5,000 saving certificate from Seneca Finance Company, an institution in which taxpayer was making an investment. When he sustained a loss in the used car selling venture and the loan to Dan White became uncollectable, he instructed the office manager to

---

4. Taxpayer's estate was given a credit against this amount for the decrease in the income tax for 1963 as a result of the downward adjustment of the capital gain figure.

5. The burden of establishing such an intention is upon the taxpayer. See, e. g., Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933) ; Botany Worsted Mills v. United States, 278 U.S. 282, 289–290, 49 S.Ct. 129, 73 L.Ed. 379 (1929) ; Gurtman v. United States, 237 F.Supp. 533, 535 (D.C.N.J.1965), aff'd per curiam 353 F.2d 212 (C.A.3, 1965).

increase the allowance for bad debts so as to absorb the loss in whole or in part.

In support of its pivotal finding on the issue of intent, the district court found that the taxpayer, after 1958, did not have the financial ability to repay the withdrawals. The estate argues that this finding is completely erroneous. Where a taxpayer is financially unable to repay amounts claimed to be loans from his closely held corporation, it is some indication that he never intended to repay the sum in the ascertainable future. See C. I. R. v. Makransky, *supra*. On the other hand, the fact that he is able during a part or all of the periods in question need not, as a matter of law, prevent the fact-finder from concluding that the intent to repay did not exist. But since the court's finding appears to be an important factor in its ultimate finding on taxpayer's intent, we will canvass the evidence on this point.

When the taxpayer began withdrawing funds from Down-State he was financially able to repay those funds. As the withdrawals increased, we think the evidence supports the inference that unless he sold his interest in Down-State or borrowed elsewhere, the taxpayer did not have the financial ability to repay them.

On the credit side, he owned real estate, in his and his wife's name, worth $36,000, and two automobiles valued at $7,500. He had life insurance in the amount of $41,000. He also held stock in Seneca Finance Company and a half interest in both Atlas Cutlery and Dan's Auto Mart. All told, he invested $25,000 in Seneca Finance and put $42,000 in Atlas Cutlery. The estate offered no evidence to show that the taxpayer was using his salary and not the withdrawals for investment purposes. If he were using only the withdrawals for that purpose, then the value of those business ventures may not be taken into account in determining taxpayer's ability to repay the withdrawals. But even if we assume that he used only his salary, the Seneca Finance investment may not be

considered as an asset. During the investment period, Seneca was heavily indebted to another finance company and there is no proof that this loan did not put Seneca in the red. Dan's Auto Mart turned out to be a bad investment. On the debit side, taxpayer owed his brother $35,000 and Producers Bank & Trust Company a like amount, and his life insurance policies had been given as collateral for the loans. At most, the taxpayer had net assets of $15,000. This is not enough to overcome the court's findings.

The estate claims the district court's findings are clearly erroneous in the light of the valid objective evidence which it asserts supports taxpayer's position. It points out that the taxpayer, when referring to the disbursements in issue, informally used such terms as "owe," "loan," "indebtedness," "note," "interest," the withdrawals were characterized as loans on the records of Down-State, a demand note was given by him as security, and "interest" on the amounts advanced was paid. The nomenclature used is a factor to be considered, but it is not controlling. True a note payable on demand was given. But the taxpayer had no fear of the prospect of Down-State ever insisting that the note be paid; he made all the non-routine decisions for Down-State. To be sure, an amount equal to the rate of one-half of one percent was deducted from taxpayer's monthly salary check and that this amount was posted in the books of Down-State as interest received from the taxpayer. Calling these entries "interest payments," in our opinion, begs the question. Within limits, taxpayer had complete control over the amount of his salary payments. He could have increased or decreased them as he saw fit, and determined the time when they should be paid. So whether amounts were or were not deducted from his salary payments is immaterial, for the net effect on Down-State's financial status would have been the same. They came from assets of the corporation.

It is true that in a letter dated February 2, 1960, to the loan office manager of Down-State, after requesting a $10,000 withdrawal and the giving of a promise to send a note upon its receipt, the taxpayer stated: "Will then make some arrangements with you shortly after for liquidation [of sums withdrawn] on a monthly basis. It will take some time, but it will be done. If need be I can put my hands on at least $25,000.00 or $30,000.00 in a hurry." The factfinder did not accept this statement at face value. It was not bound to do so. It was justified in giving it no weight for the taxpayer never did make any arrangements for repayment, but on the contrary, continued to make withdrawals to the tune of $43,500.

■ Finally, the estate claims the findings are clearly erroneous because, allegedly, the court improperly treated the three years before it as a unit instead of looking at each year on an individual basis. Apparently this ground is asserted because the Government concedes that up to 1959, the taxpayer had the bility to repay the amounts withdrawn. We think the district court was aware that the outcome was not an all or nothing proposition for the taxpayer. The ability to repay, as we have pointed out, does not compel a finding that disbursements are loans. Merely because a separate action was brought for each of the years involved did not require the factfinder to view each of those years independent of the others. What may appear to be a debtor-creditor relationship from dealings viewed within a certain span of time may turn out to be a mirage when later transactions are taken into account. The circumstances surrounding disbursements in later years and their cumulative effect may be considered in determining a taxpayer's intent prior to those years.

During the year 1959, the taxpayer withdrew $13,500 in two payments, one in June for $10,000, and the other in September for $3,500, from Down-State. In March of the same year he endorsed a check for $5,000 to that corporation. The district court did not specifically mention the $5,000 "payment" in its findings, but listed the withdrawals for 1959 as a net amount or $8,500 (i. e., $13,500 minus $5,000). By stating the net amount only, the district court did not completely disregard the $5,000 payment. The fact that the court set forth the net amount is an indication that it did not ignore that payment. We see no need, as was the case in Imbesi v. C. I. R., 361 F.2d 640 (C.A.3, 1966), to remand the matter for its re-evaluation of taxpayer's intent to repay in each of the three actions in light of the $5,000 payment.

The judgment in each of the three actions will be affirmed.