UNITED STATES of America, Appellee,

v.

Peter POMPONIO, Paul Pomponio,
Appellants.

No. 74–1758.

United States Court of Appeals,
Fourth Circuit.

Resubmitted after remand April 18, 1977.

Decided Oct. 6, 1977.

Alan Y. Cole, Washington, D. C. (Lee A. Schutzman; Cole & Groner, Stuart E. Seigel, Cohen & Uretz, Washington, D. C., Philip J. Hirschkop and Leonard S. Rubenstein, Washington, D. C., Philip Hirschkop & Associates, Ltd., on brief), for appellants Peter Pomponio and Paul Pomponio.

Thomas K. Moore, Asst. U. S. Atty. (David H. Hopkins, U. S. Atty., Frank W. Dunham, Jr., Justin W. Williams, Asst. U. S. Attys., and Charles E. Brookhart, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., on brief) for appellee.

Before RUSSELL, FIELD and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

Peter and Paul Pomponio were convicted in the district court of willful evasion of federal income taxes for the years 1969, 1970, and 1971.[1] Their appeal challenging the validity of the convictions is now before us for the second time. In *United States v. Pomponio*, 528 F.2d 247 (4th Cir. 1976), we reversed on the ground that the district court inadequately instructed the jury on the essential element of willfulness. The Supreme Court granted the government's petition for certiorari and reversed in 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976), holding that the trial court's instruction on criminal intent was proper, thus reinstating the convictions. The case was remanded to us with instructions to consider the assignments of error raised which we found unnecessary to reach in our previous disposition. In obedience to the mandate, we have considered the remaining contentions on appeal, and conclude that the convictions should be affirmed.

The appellants, together with a third brother, Louis Pomponio,[2] owned and operated several closely-held corporations engaged in real estate development in the vicinity of northern Virginia. They and their attorney, Charles Piluso,[3] were charged in a thirteen count indictment with three counts each of willfully filing false income tax returns (one count for each year in question for each defendant), and one count of conspiring to defraud the United States. The substantive counts related to the Pomponios' individual income tax returns, and consisted of: (1) failing to report as income certain monetary advances received from closely-held corporations controlled by the Pomponios; and (2) deduct-

---

1. 26 U.S.C. § 7206(1) states:

 Any person who—
 (1) Declaration under penalties of perjury.— Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter;

 . . . . .

 shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution.

2. The trial of Louis Pomponio was severed because of his illness.

3. By order of this court, Piluso's conviction was remanded to the district court for dismissal on account of a plea bargain with the government.

ing from personal income a claimed partnership loss of $119,000 in 1971, which the government claimed was properly allocable to one of the Pomponio corporations.

The conspiracy count related to the alleged falsification of corporate tax returns and, for that reason, was severed from the trial on appellants' motion following the government's opening statement, as we will discuss in more detail below.[4]

The Pomponios' position is that the advances received from their corporations were merely loans, not reportable as income, and were correctly treated as such for income tax purposes. They claim that, even if the advances should have been treated as income, the error was not willful, in that they relied on their accountant, Bates, who was responsible for preparing the returns. They further assert they were entitled to deduct as a partnership loss on their individual returns a loss sustained by one of the Pomponio corporations, the Virginia Corporation, for the reason that, when the corporation sustained the loss, it was acting only as an agent of PHB Associates, a partnership in which the appellants were partners.

## I.

## SUFFICIENCY OF THE EVIDENCE

▮▮▮ We reject the Pomponios' defense of reliance on their accountant in treating the advances as loans,[5] as well as their reliance on the principle that, when it is problematical as a matter of law whether a taxpayer's unreported income is taxable, mere errors in judgment will not give rise to criminal liability. *United States v. Critzer*, 498 F.2d 1160 (4th Cir. 1974). Both assertions are applied to the proposition that the criminal law concerns itself only with willful violations of the tax laws, not with inadvertent errors made in good faith. *United States v. Bishop*, 412 U.S. 346, 360–61, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973); *Spies v. United States*, 317 U.S. 492, 496, 63 S.Ct. 364, 87 L.Ed. 418 (1943). But in this

case, they constitute no more than defenses which were rejected by the jury as the triers of fact; for, as to the first defense, the *sine qua non* of a bona fide non-reportable loan is the taxpayer's own intention to repay. See *Estate of Taschler v. United States*, 440 F.2d 72 (3d Cir. 1971); *Livernois Trust v. Commissioner*, 433 F.2d 879 (6th Cir. 1970); *Commissioner of Internal Revenue v. Makransky*, 321 F.2d 598 (3d Cir. 1963); 1 Mertens, *Law of Federal Income Taxation* § 9.21. As to the second defense, that loans which are not actually such are income, is beyond argument. If the Pomponios intended to repay the advances, the sums advanced to them did not constitute reportable income, as the jury was instructed. While there may be instances in which an accountant's interpretation of the tax laws can justifiably be relied upon by a taxpayer, even if erroneous, see *United States v. Pechenik*, 236 F.2d 844 (3d Cir. 1956), certainly these cannot include cases where the only real question bearing on the correctness of the returns, as here, is one of the taxpayer's own intent.

The Pomponios knew, at the time they signed their tax returns, whether they had received funds from their corporations with the intention of repaying them. On the question of their own state of mind, a matter of fact, they can hardly claim reliance on their accountant, for it was incumbent upon them to inform Bates that the advances were not loans if they had no intention of repayment. As one court has repeated, "a taxpayer cannot shift the responsibility for admitted deficiencies to the accountants who prepared his returns if the taxpayer withholds vital information from his accountants . . . ." *United States v. Lisowski*, 504 F.2d 1268, 1272 (7th Cir. 1974); *United States v. Scher*, 476 F.2d 319, 321 (7th Cir. 1973).

▮▮▮ The nature of that intent was a question of fact for the jury's resolution. See *Livernois Trust*, at 883. In this criminal prosecution, the principal question that

---

**4.** See part IV of this opinion.

**5.** See, e. g., *United States v. Mitchell*, 495 F.2d 285, 288 (4th Cir. 1974).

presently concerns us with respect to the advances is whether the evidence was sufficient for the jury to have found beyond a reasonable doubt that the advances were not loans, that is, that no intent to repay them existed, and that the defendants knew they were not loans. We think the evidence was ample to sustain such findings. For example: although the advances were treated as loans on the books of the Pomponio corporations, it is undisputed that no date was fixed for repayment, and no notes were executed by the Pomponios as evidence of indebtedness; neither was any security given to guard against the contingency of default, nor was interest charged or paid with respect to the advances.[6] We have approved reference to similar criteria in distinguishing loans from contributions to capital for the purpose of bad debt deductions, see *Road Materials, Inc. v. Commissioner of Internal Revenue*, 407 F.2d 1121, 1125 (4th Cir. 1969), and the jury here was entitled to conclude on the basis of such factors that the loans, approximately in the aggregate 2.5 million dollars, in the three pertinent years, were not made as loans in these circumstances.

 We realize that a course of self-dealing between individuals and their closely-held corporations must be considered from both sides. On one hand, the need to examine closely the substance of the transactions, as well as the form in which they are couched, is especially acute; thus, the fact that the advances were formally treated as loans on the corporate books is not controlling. *Road Materials, Inc., supra.* On the other hand, the possibility exists that bona fide loan transactions may be carried out in the informal manner presented here within closely held corporations. But these are circumstances for the jury to have weighed and have less force on appeal where our reviewing role as to factual matters is limited to ascertaining whether the jury's verdict is supported by substantial evidence, viewed in the light most favorable

to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Sherman*, 421 F.2d 198, 199 (4th Cir.), cert. den. 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970).

The inclusion of the 1971 loss on account of the PHB partnership requires inquiry into this additional basis for conviction on the 1971 tax evasion counts.

The Virginia Corporation was formed by the Pomponios in 1970 for the purpose of constructing a building on land to be acquired in the District of Columbia. The defense contends that, as a condition for providing additional, necessary financing for the project after construction had commenced, a New York financier named Ginsberg required that ownership of the land and building be placed in partnership form. Thus a limited partnership, PHB Associates, was formed, with the three Pomponio brothers, attorney Piluso, and Ginsberg as partners, as well as PHB Realty, Inc.

In addition to the limited partnership agreement, a nominee agreement was executed which provided that, in this real estate transaction, the Virginia Corporation would act as an agent for PHB, and would hold title to any real property belonging to the partnership. Although it appears that a deed was executed conveying the Washington, D. C. property from the Virginia Corporation to PHB Associates, record as well as actual title to the property was retained in the corporation's name. The deed to PHB was never recorded.

Accountant Bates testified that, based on the limited partnership agreement furnished him by the Pomponios, and acting pursuant to their instructions, he treated the Virginia Corporation as the agent of PHB, disregarding the corporation as a taxable entity and allocating its 1971 loss of over $950,000 to the partnership. Each defendant's 1971 tax return reflected his share of the total partnership loss.

6. For a discussion of these and other factors, see 1 Mertens, *Law of Federal Income Taxation* § 9.21 and cases cited therein.

■ The government challenged the propriety of the deduction, claiming the loss was that of the Virginia Corporation, and could only have been deducted by that corporate entity. It is not disputed that, where a true agency relationship exists, the agent may be disregarded for tax purposes and its profits or losses attributed to the principal. *National Carbide Corp. v. Commissioner of Internal Revenue*, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949); see *Moline Properties, Inc. v. Commissioner of Internal Revenue*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943). The relevant factors in determining whether a corporate agent must be passed over for tax purposes in deference to its principal relate not to the mere fact of whether or not a formal contract of agency has been executed, *National Carbide*, p. 436, but whether the business purpose of the claimed agent is to carry on "the normal duties of an agent." Id. at 437, 63 S.Ct. at 734, including the "usual incidents of an agency relationship". Id. at 439, 63 S.Ct. at 735.

■ Judged by this test, we are satisfied that the evidence was sufficient for the jury to have found beyond reasonable doubt that the Virginia Corporation's loss was improperly allocated to the PHB partnership, and that the defendants were aware of that fact when they signed their 1971 tax returns. With respect to the propriety of the deduction, the jury was presented with substantial evidence that the Virginia Corporation continued to operate as an independent corporate entity, and not as an agent for PHB.

For example, Virginia Corporation bank records, introduced by the government and unexplained, fail to indicate that any payments were made by the corporation to its principal, PHB Associates.[7] In addition, throughout extensive negotiations with the General Services Administration over the lease of the Washington real estate, the Virginia Corporation did not reveal that it was acting as agent and not as principal;

no reference of any kind was made to PHB or to the unrecorded deed transferring title to PHB from the corporation. One exhibit is particularly instructive: in making a GSA Form 1364 "Proposal to Lease Space to the United States of America," Paul Pomponio twice listed the Virginia Corporation as the "Offerer," and in blank # 14, "Offeror's Interest in Property (Owner, agent, etc.)," Pomponio twice responded "Owner."

This evidence, and more, such as testimony that PHB Associates had no bank account; that the corporation had retained record title as of two days before trial; and had itself paid the expenses listed on the partnership return, provides strong support for the verdict below.

The jury also heard testimony that PHB Associates, to the knowledge of the defendants, was not, and could not have been, validly formed in accordance with the limited partnership agreement. The agreement specified that all stock of the Virginia Corporation would be contributed to the capital of PHB, and, according to the defendants' own version of the facts, the only purpose for which PHB was formed was to assume ownership of the Washington property in place of the corporation as a condition of obtaining Ginsberg's loan. But the defendants knew in advance that PHB could not, as it did not in 1971, acquire possession of the corporation's stock, because they had previously placed it in an escrow, which existed until 1972, as collateral for a debt unrelated to these proceedings, and we are not told of any transfer of ownership subject to the escrow. Moreover, the partnership could not have acquired an unencumbered fee title to the Washington property, as called for in the partnership agreement, because, as the defendants must have known, the individual from whom they had purchased the property held a deed of trust in his favor on the land. While these last facts are, to be sure, circumstantial evidence, they weigh in the government's favor.

---

7. Check # 424, in the amount of $7,708.00, dated June 30, 1971, and paid to the order of a New York City law firm, does contain this cryptic reference: "Re: P. H. B. Associates." The record offers no explanation for the check.

Viewing the facts in the light most favorable to the government, the jury could certainly have concluded that the Virginia Corporation was never intended to become the agent of the partnership, rather that it remained the principal, and, indeed, that the formation of PHB was a sham.

## II.

## PUBLICITY BEFORE AND DURING TRIAL

█ Of the many[8] assignments of error raised by the Pomponios, they emphasize the district court's refusal to conduct an individualized, in camera voir dire examination to probe the effect of pre-trial publicity on each member of the venire, and its refusal to question each juror at the conclusion of the trial concerning the effect of publicity during the trial.[9]

On several occasions we have defined the scope of a trial judge's obligation to make particularized inquiries concerning the effect of extensive press coverage both prior to and during a criminal trial.

In *United States v. Sawyers,* 423 F.2d 1335 (4th Cir. 1970), on facts very similar to those before us here, we approved the trial judge's refusal to question veniremen individually about what each had heard or read about the case, a prosecution for conspiracy to commit bribery. We emphasized that, "[t]here were no specific headlines, news reports, or editorials brought to the attention of the trial judge as possible sources of

prejudice." 423 F.2d at 1344. In these circumstances, general questions addressed to the venire as a whole, requiring each member to assess his ability to render a just verdict based only on the evidence adduced at trial, were deemed sufficient.

While we reversed in the more recent cases of *United States v. Hankish,* 502 F.2d 71 (4th Cir. 1974), and *United States v. Pomponio,* 517 F.2d 460 (4th Cir.), cert. den. 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975), a case involving these same defendants, the facts were different. In *Hankish,* an article appeared during trial characterizing the defendant as a "Wheeling [West Virginia] rackets figure," and alleging that he "directed operations" of a theft ring, unrelated to the ongoing prosecution.[10] We held that the trial judge's refusal to ascertain from each juror whether he had read this prejudicial article, which had been called to the court's particular attention by defense counsel, constituted reversible error.

Of similar import is our holding in *Pomponio,* supra, where we explicitly stated, "[s]uch articles must be brought to the court's attention, as these were by the attorneys, to enable it to make an initial determination as to whether the information is in fact prejudicial . . .." 517 F.2d at 463.

█ The analysis we have consistently employed in cases of this nature re-

8. The defendants have filed 14 principal assignments of error, five of which are subdivided for a total of 24 grounds for reversal. We have considered the assignments of error not especially mentioned here and are of opinion they are without merit. The main assignment mentioned in oral argument was the sufficiency of evidence in its various aspects but we do not infer any assignments were waived for others were later emphasized.

9. Appellants also assert as error the trial court's denial prior to trial of a motion for change of venue. In *Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966), the Supreme Court implied that a change of venue is a desirable, and perhaps mandatory protection "where there is reasonable likelihood that prejudicial news prior to trial will prevent a fair trial". We do not find,

however, any such likelihood in this case. There was no *Sheppard*-type publicity such as "editorials or slanted articles demanding conviction", *United States v. Sawyers,* 423 F.2d 1335, 1343 (4th Cir. 1970), and appellants thus did not rebut the presumption of impartiality of prospective jurors. *United States v. Morlang,* 531 F.2d 183, 187 (4th Cir. 1975). Indeed, the record does not show the defendants even filed affidavits that they would be unable to get a fair trial. The questions the defendants wanted the court to ask each individual juror were: "How many articles did you read? Did you follow it daily? What type of articles did you read?" No specific article was pointed out to the court as especially damning.

10. 502 F.2d at 76.

quires the party seeking an individualized inquiry into the effect of publicity to bring specific examples of allegedly prejudicial publicity to the attention of the trial court. Only then can the court determine if the publicity is of a sufficiently prejudicial nature to mandate individual questioning of jurors or veniremen. *United States v. Jones,* 542 F.2d 186 (4th Cir. 1976). General allegations of damaging publicity are sufficiently dealt with by questions and admonitions addressed to the panel as a whole. 542 F.2d at 195, n. 11; see *United States v. Thomas,* 463 F.2d 1061 (7th Cir. 1972); *Margoles v. United States,* 407 F.2d 727 (7th Cir.), cert. den. 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969).

■ We agree with the government that, because the defendants here failed to bring specific items of allegedly damaging publicity to the court's attention to enable it to determine independently whether individual questioning was either necessary or desirable, the court had no obligation to conduct such questioning. The defendants simply dumped the multitude of articles on the court, about 110 at one time and 28 [10a] at another, apparently hoping to make an impression on the basis of quantity alone, see *United States v. Jones,* supra; *United States v. Hankish,* supra, and inviting error when they asked the trial court to wade through the voluminous items of publicity without even the benefit of counsel's help in pinpointing objectionable matter.

■ The steps taken by the district court were sufficient. First, a continuance of one month was granted on defendants' motion (defendants filed motions the same day asking for a change of venue and a continuance.) In its voir dire examination, the court strenuously admonished the venire that, if any prospective juror had the slightest doubt of his ability to disregard anything he had heard or read about the case, and to decide the case on the basis of the evidence only, he must give the defend-

ants the benefit of that doubt and step aside. See *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *United States v. Sawyers,* supra. During trial, the judge instructed the jury at the close of each day's session to refrain from reading any news accounts of the trial or listening to any news broadcasts.

On the facts of this case, especially where the community was by no means flooded with sensational journalism of the *Sheppard v. Maxwell*[11] variety, *Sawyers,* p. 1344, no more was required of the district court on the basis of the defendants' general allegations of prejudicial publicity occurring prior to the trial.

■ We also note the defendants' did not challenge to the favor, individually or collectively, any of the jurors who had indicated he had read something about the case. The absence of such a challenge in our opinion constitutes a separate and alternate ground for refusing to reverse the convictions because of pre-trial publicity when, as here, the claim is that the jury was infected by the pre-trial press. *Frazier v. United States,* 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187 (1948); Beale's *Criminal Pleading and Practice,* § 245 (1899). See *Queen v. Hepburn,* 7 Cranch 290 (Feb. Term 1813).

### III.

### ALLEGED TRIAL COURT INTERFERENCE WITH THE TRIAL

Appellants characterize the district court's role in the trial as "interference," and claim that this "interference in the trial process was so pervasive and so prejudicial that appellants could not receive a fair trial." They further characterize the court's "interference" as assuming "the role of the prosecuting attorney," and point out twenty examples extracted from the trial transcript. Three of these twenty instances have been selected for our particular attention by appellants as those they say are

---

**10a.** The 28 articles, the latest of which was published February 7, 1974, were filed with the court February 11, 1974. The jury was not impaneled until March 19, 1974.

**11.** 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

worst examples of the trial court's interferences. We have considered all the claims and conclude that no error has occurred.

The first of the three interferences expressly pressed by appellants occurred during the government's direct examination of H. Burton Bates, the chief accountant for the Pomponios. At one point the trial court directed the government's attorney to ask Bates "why he used corporate figures to make a partnership return." The court further stated, "If you don't, the Court will." The following then transpired:

Question by the prosecutor:

Q. The Court has directed me to ask why you used corporate figures to prepare a partnership return.

A. I was furnished with a partnership agreement at the time the tax return was done and that partnership agreement indicates that the partnership was the acting party and the corporation was acting as an agent or nominee for the partnership, and under those instructions I prepared it under the partnership law.

THE COURT: It was in the agreement or did any of the POmponios [sic] so instruct you?

THE WITNESS: It is in the partnership agreement and they also told me.

THE COURT: All right. So you did it—Theyhanded [sic] you an agreement and told you to do it that way?

THE WITNESS: Told me the partnership had replaced the corporation and here is the partnership agreement and—

THE COURT: All right.

THE WITNESS: —you should make it up as a partnership.

THECOURT [sic]: All right.

Appellants find from this colloquy that the court was "seeking to create the impression of wrongdoing," and that "the court, while purporting to sum up Bates' testimony, twisted it." We do not agree. There is nothing here that indicates the court was seeking to create any impression. What appears is merely a question by the court eliciting a response from Bates as to the role of the Pomponios, if any there were. Further, the trial court's question to Bates that "they handed you an agreement and told you to do it that way" does not at all appear to be a twisted or distorted account of Bates' testimony that "[i]t is in the partnership agreement and they also told me."

The second example cited by appellants occurred during the cross-examination of Bates. Defense counsel was questioning Bates as to why he treated the advances from the corporations to the appellants as loans, rather than as reportable income. Bates' response and the trial court's questions of Bates are found on pages 315–319 of the transcript. Appellants characterize the court's questioning here of Bates as "badgering," and add that the "net impression left" from the exchange "could only have been that the defendants could not honestly have treated the advances as loans at all." Again, we find no error. The court's questions to Bates were directed toward discovering how the accountant understood that the advances were loans to be repaid, and what conversations Bates may have had with the Pomponios that led to the understanding. No badgering appears, and we do not think the court assumed the role of the prosecuting attorney. Thus, we do not find the trial court created any impressions adverse to defendants. Such impressions, if any there were, derived solely from the responses of the accountant and did not differ from impressions that may be created from any witness' response to a relevant question.[12] Without copying in the opinion the pages referred to, it suffices to say the tone of the questioning in this and the following example are equally as innocuous as is the first cited.

The final instance stressed by appellants transpired during the trial court's examination of Bates after the government and defense had finished their questioning of

12. "[The trial court] should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other." *Simon v. United States,* 123 F.2d 80, 83 (4th Cir.), cert. den. 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555 (1941).

Bates. The record, transcript p. 459–461, according to appellants, reveals that the trial court "stressed only the guilt of defendants." We find no such stress revealed by the transcript. The court's questioning of Bates as to whether there was any pattern to the advances made to the Pomponios or payments from them seems to have been thoroughly impartial; no impermissible advocacy is revealed. In fact, the effect of Bates' answers to the effect that there was no pattern may have been exculpatory, and one case has so implied.[13]

There are two points we have found in the transcript where the trial court in its extensive charge referred to the disputed advances as "items of income," when whether or not these advances were in fact reportable items of income was a matter for the jury. But in view of the trial court's numerous instructions to the jury that it was the government's contention that the advances were reportable income (Appellants' Combined Appendix Volume II at 869, 870, 872, 873, 877, 882), that the jury alone should determine whether the advances were reportable income (Appellants Combined Appendix Volume II at 868, 878, 881) and that bona fide loans were not reportable income (Volume II at 868, 869, 881, 882, 889, 890, 891), together with a standard reasonable doubt instruction (Vol. II at 873, 874), we do not think there is a reasonable likelihood the court was misunderstood or the jury confused.

## IV.

The final points stressed by appellants are the trial court's allegedly improper regulation of the testimony of accountant Bates, and the court's "allowance of extensive comments upon charges which had been severed from the trial, but which had been contained in the government's opening statement, without a limiting instruction to the jury . . .."

 The regulation of Bates' testimony requires, we think, little comment. In addition to their complaint about the testimony previously quoted, defendants say the trial court too explicitly questioned Bates on another matter. Bates had testified that the advances were loans to be repaid and that he had so understood from the defendants. The court asked Bates for specific conversations with the defendants when they had so advised him. Upon receiving indefinite answers, the court pressed for them. We do not think this is error, or that the judge did any more than try to bring out the facts of the case. *Simon,* supra.

*United States v. Brown,* 540 F.2d 364 (8th Cir. 1976), and *United States v. Prieto,* 505 F.2d 8 (5th Cir. 1974), dispose of defendants' remaining ground emphasized. In his opening statement, the prosecutor in each of those cases discussed the expected testimony with respect to a count which was later reversed. In *Prieto,* the trial judge did not instruct the jury to disregard the statements, while in *Brown* he did. The outcome was the same in both cases and affirmance resulted. Here, as in both those cases, there was no improper conduct of the procedures involved. Also, in the case of *United States v. DeRosa,* 548 F.2d 464 (3d Cir. 1977), the court affirmed a conviction despite a too detailed opening statement of damaging facts the prosecutor expected to prove but was later unable so to do because of their exclusion as evidence. *DeRosa* affirmed the conviction, although the conduct of the prosecutor was criticized, because of the court's later instruction to disregard the statement.

 We are of opinion that the trial judge here gave adequate limiting instructions. The court told the jury in advance that the opening statements were not evidence; when it severed the conspiracy charge, it told the jury no longer to consider

---

13. The jury may have thought that the absence of any correlation between the amounts of the advances and the equity interests of the recipients in the corporations indicated that the advances were more likely to be bona fide loans than taxable dividends as claimed by the government. *Clark v. Commissioner of Internal Revenue,* 266 F.2d 698, 711 (9th Cir. 1959) (withdrawals in proportion to shareholders' respective interests indicates dividend, not loan status.)

it; and in its charge near the end of the trial, the court repeated that the opening statements were not evidence. We express no opinion on a case in which no such instructions are given.

We thus affirm appellants' convictions. While the record of trial does reveal participation by the trial judge, especially in a complicated, although not extended, case like this, such neutral participation is not error. *United States v. Cole,* 491 F.2d 1276 (4th Cir. 1974); *Simon v. United States,* 123 F.2d 80, 83 (4th Cir.), cert. den. 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed.2d 555 (1941).

*AFFIRMED.*