**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 15-4097**

---

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

     v.

JONATHAN D. DAVEY,

               Defendant - Appellant.

---

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Robert J. Conrad, Jr., District Judge. (3:12-cr-00068-RJC-DSC-1)

---

Argued: May 12, 2016            Decided: September 8, 2016

---

Before TRAXLER and WYNN, Circuit Judges, and Norman K. MOON, Senior United States District Judge for the Western District of Virginia, sitting by designation.

---

Affirmed by unpublished opinion. Judge Wynn wrote the opinion, in which Judge Traxler and Senior Judge Moon joined.

---

**ARGUED:** Gary Alvin Bryant, WILLCOX & SAVAGE, PC, Norfolk, Virginia, for Appellant. Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Dianne K. Jones McVay, JONES MCVAY LAW FIRM, PLLC, Dallas, Texas, for Appellant. Jill Westmoreland Rose, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Jonathan Davey ("Defendant") appeals his jury convictions for conspiracy to commit wire fraud, conspiracy to commit money laundering, and tax evasion, as well as a related award of restitution. Defendant contends that the district court erred in excluding certain evidence, that there was insufficient evidence supporting his conviction for tax evasion, and that restitution was improperly calculated. We reject these arguments, and affirm.

I.

A.

Evidence produced at trial revealed the following. In 2007, Defendant created a hedge fund named "Divine Circulation Services" ("DCS"). Over the following two years, he solicited millions of dollars in funds from numerous entities and private individuals, and through DCS, he invested that money in four different business ventures, each of which either failed or turned out to be fraudulent.

By February 2009, one of the only DCS investments that was purportedly still profitable was with a supposed hedge fund called "Black Diamond," which was later revealed to be a Ponzi scheme. That month, Black Diamond's founder, Keith Simmons, met with Defendant and other hedge fund managers with investments in Black Diamond and told them that a "cash out" was imminent. J.A.

3

146-48. In other words, said Simmons, Black Diamond soon would be shut down, and all investor money would be returned. That payout never happened. Indeed, soon after the meeting announcing the supposed cash out, Black Diamond stopped honoring withdrawal requests from its investors.

By the end of April 2009, Black Diamond was effectively illiquid, the other DCS business ventures had collapsed, and Defendant had stopped investing additional money in any ventures, including Black Diamond. Nevertheless, Defendant continued to solicit funds from new investors on the pretense that their money actually would be invested. Along with other hedge fund managers who had invested in Black Diamond, Defendant set up a "cash" or "liquid" account in which to deposit these new investor funds. J.A. 149. Instead of investing the money, Defendant used it to fulfill withdrawal requests from old investors, to pay himself a management fee, and to pay his own personal expenses. In other words, Defendant set up his own Ponzi scheme.

In addition to misrepresenting that DCS investors' money actually would be invested, Defendant made a number of other false statements in order to obtain, or retain, investor funds. For instance, Defendant told one large investor about a supposed liquidity provider that did not exist, and he falsely suggested

4

to another investor that his organization had developed and was using a successful currency trading software.

After the February 2009 meeting during which Simmons announced the Black Diamond "cash out," Defendant also helped facilitate a broader Ponzi scheme involving numerous other hedge fund managers who, like Defendant, used new investor money to fund withdrawal requests and pay personal expenses. In return for a monthly management fee, Defendant—through an entity called "Safe Harbor"—served as a hedge fund administrator, handling fund transfers to and from hedge fund cash accounts. In doing so, Defendant contributed to an effort to falsely reassure investors that their investments were sound by maintaining a website accessible to investors that showed false, positive monthly returns. DCS investors were among those with access to this website, and the investors made additional investments in reliance on the false information it conveyed. Defendant also permitted the hedge fund managers to report that they had been vetted by an "independent" accounting firm, i.e., Safe Harbor, when that was not the case. J.A. 175-76.

One of the most significant personal expenses Defendant funded with DCS investor money was the construction of a $2 million, 10,000-square-foot personal home. To channel money from DCS towards the construction of his home, Defendant created two additional entities: "Sovereign Grace" and "Shiloh Estates."

5

Essentially, Defendant transferred funds, in the form of purported "loans," from DCS to Sovereign Grace, and then from Sovereign Grace to Shiloh Estates, the legal owner of the home and direct funder of its construction. J.A. 291-98, 513.

Those "loans" had no recognized interest rates, no payment schedules, no associated liens, and no loan documentation. In late 2008, Defendant informed Barry McFerren, his brother-in-law and business associate, that he intended to default on the loans, and Defendant did so in 2009. Defendant identified $810,000 as a "loan" on his 2008 tax return, an amount corresponding to purported loan payments to Shiloh Estates in that year. J.A. 516-17.

Over time, without any truly profitable investments, the money in DCS dried up. Near the end of August 2009, when DCS had accumulated over $4 million in outstanding withdrawal requests from investors, Defendant stopped accepting additional investments. Through the fall of 2009, however, he continued to use DCS money to pay personal expenses, and he continued to accept fees from other hedge fund managers for publishing false returns on Safe Harbor's website. Outstanding withdrawal requests from DCS investors grew to over $6 million by the end of November 2009.

B.

In February 2012, the government indicted Defendant and three of the other hedge fund managers involved in the above scheme on charges of conspiracy to commit securities fraud, 18 U.S.C. § 371, conspiracy to commit wire fraud, 18 U.S.C. § 1349, and conspiracy to commit money laundering, 18 U.S.C. § 1956(h). Additionally, Defendant was indicted for tax evasion, 26 U.S.C. § 7201. The other co-defendants pled guilty, but Defendant elected to go to trial.

Over the course of a four-day trial, the government presented testimony from over a dozen witnesses, including one of the hedge fund managers who participated in the broader Ponzi scheme, Defendant's two principal employees, an IRS investigator, and numerous individuals who invested money in DCS. The defense presented testimony from five witnesses, including Defendant and Simmons.

The jury returned a verdict of guilty on all four counts. The district court sentenced Defendant to 252 months' imprisonment. The court also found Defendant and his co-conspirators jointly and severally liable for roughly $21.8 million in restitution. Defendant appealed, challenging the restitution amount and all of his convictions except his conviction for securities fraud.

7

II.

Defendant first argues that the trial court committed reversible error with regard to multiple evidentiary rulings. In particular, Defendant contends that the district court should not have excluded: (1) testimony from certain investors Defendant turned away in the fall of 2009, (2) evidence regarding certain non-fraudulent investments made by DCS, and (3) evidence that Defendant eventually paid taxes on the amount he designated as a "loan" on his 2008 tax return.

We review a district court's evidentiary rulings for abuse of discretion. United States v. Reevey, 364 F.3d 151, 156 (4th Cir. 2004). Moreover, such rulings are subject to a harmless-error standard, meaning that we will affirm notwithstanding an error if it is "'highly probable that the error did not affect the judgment.'" United States v. Ibisevic, 675 F.3d 342, 349–50 (4th Cir. 2012) (quoting United States v. Madden, 38 F.3d 747, 753 (4th Cir. 1994)).

A.

Defendant contends that the district court erred when it excluded the testimony of certain witnesses who would have testified that Defendant refused to accept their money as an investment in DCS after August 2009. He argues that such testimony was relevant to his state of mind, in that it would have suggested that Defendant took investor money not to

8

facilitate a Ponzi scheme, but rather because, through much of 2009, he believed Black Diamond was legitimate and that a cash out was imminent.

Assuming without deciding that the district court abused its discretion in excluding this evidence, any such error was harmless. The "'single most important factor'" in a harmless-error inquiry is the closeness of the case. United States v. Ince, 21 F.3d 576, 584 (4th Cir. 1994) (quoting United States v. Urbanik, 801 F.2d 692, 699 (4th Cir. 1986)).

Here, as outlined above, the government introduced at trial overwhelming evidence that Defendant and his co-conspirators solicited funds by intentionally misleading investors, in multiple ways. Even though Black Diamond had stopped fulfilling withdrawal requests and Defendant had stopped investing additional money in Black Diamond by the end of April 2009, Defendant continued to solicit investor money for several more months, falsely representing that he would invest it. That is not to mention other, more particularized false assertions Defendant made to investors—for example, about a non-existent liquidity provider.

Moreover, it was undisputed at trial that Defendant did eventually stop accepting new investments. The accounting records for DCS were introduced at trial, and Defendant testified in detail regarding the investors he refused after

9

August 2009. Indeed, defense counsel incorporated Defendant's turning away of investors into his closing argument. The government also accepted that fact as true—before explaining why it was not dispositive—during its closing.

In short, even if the trial court erred in excluding the testimony of turned-away investors, it is "'highly probable that the error did not affect the judgment.'" Ibisevic, 675 F.3d at 350 (quoting Madden, 38 F.3d at 753).

B.

Defendant further argues that the district court abused its discretion in excluding as cumulative or irrelevant certain evidence related to investments made by DCS other than Black Diamond. In particular, Defendant contends that the district court should have admitted evidence that funds DCS invested in "Amkel"—a separate venture that also turned out to be a fraud, though not one perpetrated by Defendant—had been frozen in connection with a government investigation, and ultimately recovered. According to Defendant, this evidence would have shown that DCS was a legitimate investment vehicle with real value. Further, Defendant argues that the district court should have permitted the principal of another failed DCS investment—a movie production company called "Audience Alliance"—to play a movie trailer and testify that he intended to repay the loan DCS

10

issued to the company. This evidence, too, was offered to show that DCS was not wholly fraudulent.

The district court did not abuse its discretion in concluding that the potential probative value of the Amkel and Audience Alliance evidence was "substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

First, we fail to see how evidence that DCS eventually recovered frozen funds from a different fraudulent venture is probative of Defendant's lack of intent to defraud his investors. And, as the district court reasonably concluded, such evidence could very well confuse a jury.

Second, it may be that evidence showing DCS invested partially in Audience Alliance—which, though unsuccessful, was not fraudulent—is relevant regarding Defendant's intent to defraud. However, numerous witnesses, including Defendant, testified as to the existence and nature of the Audience Alliance investment. The district court was therefore within its discretion to exclude further evidence of the Audience Alliance investment's legitimacy—including testimony from

11

Audience Alliance's principal that he intended to repay his debts one day—as cumulative.*

## C.

Defendant's final argument contesting an evidentiary ruling relates to his conviction for tax evasion. At trial, the government sought to show that Defendant evaded taxes by falsely characterizing $810,000 in payments from Sovereign Grace to Shiloh Estates—the entity that funded the construction of his home—as a "loan" on his 2008 tax return. Defendant contends the district court erred by excluding his 2009 tax return, which reported the defaulted "loan" as taxable income in 2009. He argues that this evidence tends to disprove his intent to evade taxes in 2008.

The government's theory of the case, however, was that Defendant mischaracterized the payment as a loan in 2008, and that this mischaracterization was itself a willful attempt to evade income taxes. Consequently, the relevant intent was Defendant's intent to repay—or not repay—the loan amount at the time he received it. See United States v. Pomponio, 563 F.2d 659, 662–63 (4th Cir. 1977) (explaining that the "principal

---

* To the extent that the district court excluded testimony from the Audience Alliance principal regarding his intent to repay his debt in the future on the grounds of relevance, we likewise consider that ruling to have been a proper exercise of the court's discretion.

question" relevant to a tax evasion prosecution based on mischaracterized loan payments is whether those payments "were not [actually] loans, that is, that no intent to repay them existed, and that the defendants knew they were not loans"). That one year later Defendant defaulted on the loan, recognized it as income, and paid taxes on it tends to reinforce, rather than undermine, the government's argument that Defendant did not intend to repay the "loan" when he received it.

In short, the district court did not abuse its discretion in excluding the 2009 tax return for lack of relevance.

III.

In addition to challenging evidentiary rulings, Defendant challenges his tax evasion conviction on grounds that it was not supported by sufficient evidence, and that the district court therefore erred in denying his motion for judgment of acquittal for that count under Rule 29 of the Federal Rules of Criminal Procedure. [See Appellant's Br. at 35–39]

This Court will uphold a guilty verdict "if, viewing the evidence in the light most favorable to the Government, it is supported by 'substantial evidence.'" United States v. Alerre, 430 F.3d 681, 693 (4th Cir. 2005) (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a

conclusion of a defendant's guilt beyond a reasonable doubt." Burgos, 94 F.3d at 862. In other words, the relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

The relevant criminal provision, 26 U.S.C. § 7201, makes it a felony to "willfully attempt[] in any manner to evade or defeat any tax imposed by [the Internal Revenue Code]." To establish Section 7201 tax evasion, the government must show "1) that the defendant acted willfully; 2) that the defendant committed an affirmative act that constituted an attempted evasion of tax payments; and 3) that a substantial tax deficiency existed." United States v. Wilson, 118 F.3d 228, 236 (4th Cir. 1997); see also Sansone v. United States, 380 U.S. 343, 351 (1965). "The jury may infer a 'willful attempt' from 'any conduct having the likely effect of misleading or concealing.'" Wilson, 118 F.3d at 236 (quoting United States v. Goodyear, 649 F.2d 226, 228 (4th Cir. 1981)).

Here, as discussed above, the government theorized that Defendant falsely characterized the $810,000 he transferred from Sovereign Grace to Shiloh Estates as a loan on his 2008 tax return in order to avoid paying taxes on that amount in that year. It is settled law that what defines a true loan is "the taxpayer's own intention to repay" the loan amount. Pomponio,

14

563 F.2d at 662; see also Comm'r of Internal Revenue v. Tufts, 461 U.S. 300, 307 (1983) ("When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date. Because of this obligation, the loan proceeds do not qualify as income to the taxpayer."); United States v. Beavers, 756 F.3d 1044, 1057 (7th Cir. 2014) (explaining that "loan proceeds are not income because the taxpayer has incurred a genuine obligation to repay the loan" and that "the recipient must actually intend to repay" for a transaction to qualify as a loan).

Defendant does not dispute that he characterized the $810,000 transfer as a loan on his 2008 tax return or that there was a resulting tax deficiency in that year. Consequently, the relevant legal question is whether Defendant's characterization of the transfer as a loan on his tax return was accurate, i.e., "whether the evidence was sufficient for the jury to have found beyond a reasonable doubt that the [transfer was] not [a] loan[], that is, that no intent to repay [it] existed." Pomponio, 563 F.2d at 662–63.

In answering that question, both direct evidence of intent and circumstantial evidence regarding the nature of the transaction are relevant. See id. at 663 (finding sufficient evidence that various advances were not loans where there was no fixed repayment date, no notes evidencing the debt, no security

15

backing it, and no interest charged or paid on the amount); see also Merck & Co. v. United States, 652 F.3d 475, 481 (3d Cir. 2011) ("[D]etermining whether a transaction qualifies as a loan requires analysis both of the objective characteristics of the transaction and of the parties' intentions.").

The government introduced direct and circumstantial evidence that Defendant did not intend to repay the $810,000 transfer when he received it, and therefore that the transaction was taxable income, rather than a loan. Barry McFerren, Defendant's brother-in-law and employee, testified that in the fall of 2008 Defendant said that he intended from the beginning to default on the purported loan, i.e., not to repay it. Defendant did in fact default on the purported loan in December 2009. Lynn Wymer, Defendant's accountant, testified that, to her knowledge, there was no interest rate governing the purported loan, no loan document, no repayment schedule, no loan payments made, and no lien securing it. Tyiesha Nixon, an IRS investigator, similarly testified that, after examining Defendant's tax returns, accounting records, and other related financial documents, she found no loan documents, nothing indicating an interest rate on the purported loan, no schedule of payments, and no lien securing it.

In short, there was sufficient evidence that Defendant falsely characterized the $810,000 transfer as a loan on his

2008 tax return. Because jurors "may infer a 'willful attempt' from 'any conduct having the likely effect of misleading or concealing,'" Wilson, 118 F.3d at 236 (quoting Goodyear, 649 F.2d at 228), there also was sufficient evidence that Defendant attempted to evade the payment of taxes in 2008. We therefore affirm the district court's denial of Defendant's motion for acquittal on the tax evasion count.

IV.

Finally, Defendant challenges the district court's restitution order, primarily on the ground that his convictions for conspiracy to commit wire fraud and money laundering are invalid. Because we affirm those convictions, that argument fails. Defendant also suggests that the district court neglected to consider amounts already available to victims from other sources, such as the funds recovered from the fraudulent Amkel investment. The record, however, contradicts that argument. In particular, the district court clarified that "[t]o the extent that there are funds available to offset the total amount of restitution, those will be applied in the restitution process." J.A. 997–98. Furthermore, the judgment expressly limits "victims' recovery . . . to the amount of their loss," so that Defendant's "liability for restitution [will] cease[] if and when the victim(s) receive full restitution." J.A. 1075.

17

We therefore reject Defendant's challenge to the restitution order.

V.

For the reasons stated above, we affirm the challenged convictions and the restitution order.

AFFIRMED