**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 96-4757

BARBARA BENTON LIS,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Elizabeth City.
W. Earl Britt, District Judge.
(CR-96-3-2-BR)

Argued: June 5, 1997

Decided: July 15, 1997

Before HALL and MURNAGHAN, Circuit Judges, and
GARBIS, United States District Judge for the District of Maryland,
sitting by designation.

_____

Vacated and remanded by published opinion. Judge Hall wrote the
opinion, in which Judge Murnaghan and Judge Garbis joined.

_____

**COUNSEL**

**ARGUED:** George Alan DuBois, Assistant Federal Public Defender,
Raleigh, North Carolina, for Appellant. Yvonne Victoria Watford-
McKinney, Assistant United States Attorney, Raleigh, North Caro-
lina, for Appellee. **ON BRIEF:** Janice McKenzie Cole, United States
Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh,
North Carolina, for Appellee.

**OPINION**

HALL, Circuit Judge:

Barbara Benton Lis appeals her conviction by a jury of embezzling government funds, in violation of 18 U.S.C. § 641. Benton contends that the district court abused its discretion by excluding, as hearsay, evidence corroborating her explanation of how she came to possess approximately $50,000 in undocumented income. We agree that the evidence should have been admitted and that its exclusion was not harmless. We therefore vacate the conviction and remand for a new trial.

I.

For 20 years, until April 1995, Lis worked at the Coast Guard Exchange System (CGES) office at the Coast Guard Support Center in Elizabeth City, North Carolina. The CGES office oversaw the operation of four retail stores, all of which accepted manufacturers' discount coupons. At three of the stores, the store manager collected the coupons and, after several thousand dollars' worth had accumulated, took them to Lis, who wrote a check on the CGES account for the coupons' face amount. The CGES checks were then entered into the stores' cash registers as sales, offsetting the refund entries that had been made when the coupons were initially accepted from the customers.

The procedure at the Main Exchange was different. There, the non-discounted price of every product sold was entered into the registers, and the coupons were treated as cash. Elizabeth Marx, the head cashier, collected the coupons from the register drawers and exchanged them for cash from the store's $6,500 change reserve. Whenever the reserve ran low, Marx telephoned Lis and requested a check in exchange for the coupons. These checks were not entered into the registers at the Main Exchange, however, because there were no refund entries to offset. Instead, the checks were cashed at a nearby credit union, and the cash was returned to the store's change reserve. From September 1991 until late 1992 or early 1993, Marx cashed the checks at the credit union. Throughout 1993 and 1994, Lis cashed the checks and took the cash to Marx. At trial, Lis testified that she

2

always made the checks out in the amount requested by Marx, and that she never bothered to total the coupons herself before mailing them in for redemption.

An audit of the CGES in March 1995 revealed a shortfall of as much as $100,000 between the ledger account of coupons receivable and the total of the actual coupons on hand or being processed; about $85,000 of the shortfall had arisen since January 1993. The calculation was made a bit more difficult by the mysterious disappearance of the redemption records on the eve of the audit, but the amounts that had been received by CGES from the coupon vendors and clearinghouses were ascertained from other sources. The shortfall was traced to the Main Exchange, and the auditor proffered two explanations: either Marx had requested checks in amounts exceeding the sum of the coupons, or Lis had issued the checks for amounts exceeding the requests.

Agent Andrew Dunphy of the Coast Guard Investigative Service interviewed Lis on March 30, 1995. In response to Dunphy's inquiries regarding her financial history, Lis said that she had received life insurance settlements of approximately $130,000 following her husband's death in April 1992, but that she had spent virtually the entire amount. Upon further questioning, it became evident that, even after the insurance proceeds had been exhausted, Lis's monthly expenditures continued to substantially exceed her wage income. Confronted with the seeming discrepancy, Lis confided that she kept a stockpile of cash -- almost $50,000 -- at her residence. Pressed by Dunphy, Lis offered several different, unconvincing explanations of the source of the additional funds. Lis finally told Dunphy that, after her husband had died, she had found the money in a box beneath the couple's bed.

Lis was found guilty of the single count of embezzlement charged in the indictment, and she was sentenced to 18 months' imprisonment. She appeals her conviction.

II.

A.

In 1993 and 1994, Lis's deposits to her personal account exceeded her documented income by almost $30,000. Lis testified that, three or

3

four months after her husband died, she found a large sum of dirty, crumpled money, mostly twenties and fifties, in one of several brief-cases lying among miscellaneous items that had been stored under the camper shell of her late spouse's pickup truck. Lis explained that her husband had sold chemicals for a living, and that, in violation of company policy, he frequently broke down larger lots to fill smaller orders. Mr. Lis collected a premium for this "service," which he kept for himself.

Lis testified that she was uncertain as to what she should do with the money, so she stowed the briefcase in a closet for a few months, where it remained until October 1992, when her sister, Nancy Pronechan, arrived from California to visit her. Lis, with the assistance of Pronechan, finally counted the money, which amounted to very nearly $50,000.

The briefcase also contained a large envelope. Inside the envelope were paper strips of various sizes, upon which Lis's husband had written summed columns of numbers. On one strip is a column of four-digit numbers, summed to total 41,424; the number 42,810 was written by itself on a separate slip of paper. The columns on the other strips totaled significantly smaller amounts.

The government objected, on hearsay grounds, to the introduction of the strips into evidence. The district court sustained the objection.

B.

1.

The strips are not hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence <u>to prove the truth of the matter asserted."</u> Fed. R. Evid. 801(c) (emphasis supplied). If the summed columns are "statements" made by the late Mr. Lis, they assert only that certain numbers add up to a particular sum. Lis did not seek to admit the papers as an assertion of the accuracy of her late husband's math skills, but as evidence of a link between her husband and the money in the briefcase.

4

There was no writing from Mr. Lis explicitly stating, for example, that "The money in this briefcase, currently exceeding $40,000, belongs to me." Had the defense attempted to introduce such a naked assertion, it would have been properly excluded under the hearsay rule. The statements that Lis instead attempted to place before the jury would have required it to draw an inference, i.e., that the numbers on the strips somehow related to the contents of the briefcase, as a prerequisite to arriving at the conclusion manifest in the hypothetical example. Because the probative value of the statements set forth on the strips did not depend on their being particularly accurate or reliable, they should have been admitted into evidence.

2.

The exclusion of these statements was not harmless. Lis's only real chance for acquittal hinged on her success in persuading the jury that the funds enabling her to live beyond her ordinary means, though perhaps ill-gotten, were attributable to her husband's misdeeds and not her own. Her task was made doubly difficult by the highly unusual way in which she asserts that she came to possess the money.

Although Lis's own testimony and that of her sister might appropriately be viewed with skepticism by the jury, the powerful inference invited by the admission of the strips bearing her husband's handwriting is harder to assail; this corroborative evidence, neutral on its face, lends plausibility to an otherwise incredible yarn. If Lis's story is believed, the government is left without a "smoking gun," and its circumstantial case becomes significantly weaker. At bottom, had the jury been allowed to consider the strips of paper, it may well have harbored a reasonable doubt that Lis was guilty of the charged offense. We are compelled to conclude that the exclusion of this evidence prejudiced Lis's right to a fair adjudication of her guilt, and, therefore, that she is entitled to a new trial. See Fed. R. Crim. P. 52(a) ("Any error . . . which does not affect substantial rights shall be disregarded.").[1]

_____

[1] Lis maintains that the district court also erred by allowing the government to present evidence that, between December 11, 1990, and March 30, 1992, in excess of her authority as treasurer of her son's Boy Scout

III.

The conviction is vacated and the case is remanded for a new trial, which, inasmuch as Lis has already served nearly half of her 18-month sentence, should be conducted as soon as practicable.

VACATED AND REMANDED

_____

troop, she deposited more than $7,000 in non-troop funds into the troop account, writing checks totaling a similar amount for deposit into her personal account. Lis testified that the money belonged to her husband, and that he had asked her to process it through the troop account; indeed, the unauthorized transactions ceased almost simultaneously with Mr. Lis's death.

Lis contends that the evidence is irrelevant, because the government failed to prove the specific losses to the CGES arising from irregularities in the coupon-handling procedure prior to January 1993. The evidence did show, however, that as much as $15,000 of the $100,000 shortfall must have accrued prior to 1993, and that Lis had the authority to issue checks on behalf of the CGES no later than February 4, 1992, about two months prior to the cessation of the unauthorized activity in the troop account. As Lis points out, though, the government has been unable to explain exactly how Lis could have been responsible for any shortfall in the coupon accounts prior to her taking over the check-cashing duties for Marx in late 1992 or early 1993.

It is nevertheless conceivable that Lis embezzled money from the CGES prior to March 30, 1992, and that she attempted to launder at least some of it through the troop account. The evidence, then, can be said to be somewhat relevant. The court below, however, does not appear to have engaged in any significant analysis under Fed. R. Evid. 403, which requires that the probative value of the troop account evidence be weighed against the danger of unfair prejudice resulting from its admission. On remand, the district court shall have the opportunity to consider the matter anew.

6