**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

             *Plaintiff-Appellee,*

v.                                    No. 11-4151

SAMIR IBISEVIC,

             *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, Senior District Judge.
(1:10-cr-00265-TSE-1)

Argued: January 25, 2012

Decided: March 14, 2012

Before MOTZ, Circuit Judge, Thomas D. SCHROEDER,
United States District Judge for the Middle District of
North Carolina, sitting by designation, and
J. Michelle CHILDS, United States District Judge for the
District of South Carolina, sitting by designation.

Vacated and remanded by published opinion. Judge Motz
wrote the opinion, in which Judge Schroeder and Judge
Childs joined.

**COUNSEL**

**ARGUED:** Geremy C. Kamens, OFFICE OF THE FED-
ERAL PUBLIC DEFENDER, Alexandria, Virginia, for
Appellant. Justin Edward Fairfax, OFFICE OF THE UNITED
STATES ATTORNEY, Alexandria, Virginia, for Appellee.
**ON BRIEF:** Michael S. Nachmanoff, Federal Public
Defender, Patrick L. Bryant, OFFICE OF THE FEDERAL
PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.
Neil H. MacBride, United States Attorney, Alexandria, Vir-
ginia, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Samir Ibisevic appeals from convictions arising from his
attempt to leave the United States carrying approximately
$40,000 in United States currency, without reporting the cur-
rency to customs authorities. In denying his motion for a new
trial, the district court acknowledged that it had erred in
excluding certain testimony at Ibisevic's trial, but concluded
that the error was harmless. Because we cannot say, with fair
assurance, that the error did not have a substantial and injuri-
ous effect on the jury verdict, we must vacate the judgment
of the district court and remand for further proceedings.

I.

A grand jury indicted Ibisevic of three crimes growing out
of his failure to declare currency when attempting to leave the
United States: bulk cash smuggling in violation of 31 U.S.C.
§ 5332(a); failing to file a required report of international
transportation of currency in violation of 31 U.S.C.
§§ 5316(a), 5324(c); and making false statements in violation
of 18 U.S.C. § 1001. The indictment also sought forfeiture of
the currency "[u]pon conviction of the offenses."

The only issue disputed at trial was Ibisevic's intent. All three offenses required the Government to prove Ibisevic knowingly or intentionally violated the law. *See* 31 U.S.C. § 5332(a)(1) (making it unlawful to "knowingly conceal[ ] more than $10,000 in currency" "with the intent to evade a currency reporting requirement"); *id.* §§ 5316(a), 5324(c) (making it unlawful to "fail to file" an accurate currency report "for the purpose of evading the reporting requirements of section 5316"); 18 U.S.C. § 1001(a) (making it unlawful to "knowingly and willfully . . . make[ ] any materially false, fictitious, or fraudulent statement or representation"). Ibisevic steadfastly contended that he had no intent to knowingly or intentionally violate any of these statutes; instead, Ibisevic maintained that, because of his poor English, he simply did not understand questions put to him by customs agents.

A.

The evidence at trial revealed that on June 18, 2010, Ibisevic and his mother, Rahima, attempted to board a flight at Dulles International Airport in Virginia to Vienna, Austria, with final service to Sarajevo, Bosnia. They were traveling to Bosnia to attend the funeral of Ibisevic's father.

When Ibisevic and Rahima proceeded down the corridor leading to the plane's jetway, Officer Andres Zayas of the United States Customs and Border Protection ("CBP"), who speaks English with a Puerto Rican accent, approached them. As part of a currency interdiction effort that involves random inspections of passengers departing on outbound international flights, Officer Zayas asked Ibisevic questions concerning the purpose of his trip and his line of work. During this questioning, Rahima and CBP Officer Steven Rodeheaver stood within earshot.

Officer Zayas testified that he then asked Ibisevic "the currency question." That is, Officer Zayas explained that it was not illegal to "carry over $10,000 out of the country," but if

a person was carrying more than $10,000, he was required "to fill out a form." According to Officer Zayas, he asked Ibisevic if he was "travelling with money" or "carrying any cashier's check, money orders, [or] any other type of monetary instruments?" Officer Rodeheaver testified that Officer Zayas asked Ibisevic:

> How much currency are you travelling with? That is to include all currency—reportable currency instruments such as cashier's check, money orders, Traveler's checks; that's including any currencies that you are carrying for other peoples, in [sic] your person and on [sic] your luggage.[1]

Ibisevic answered, $5,000. Officer Zayas led Ibisevic and his mother to a "more private area inside the corridor" with their luggage. He asked again how much currency they were traveling with "as a whole." Ibisevic again said, $5,000. Officer Zayas then gave Ibisevic the CBP form explaining the currency reporting requirements. The form states that "[i]t is legal to transport any amount of currency or other monetary instruments into or out of the United States," but explains that an individual must file a report when transporting or attempting to transport "currency or other monetary instruments in an aggregate amount exceeding $10,000."

After allowing Ibisevic a minute or two to read the CBP form, Officer Zayas asked Ibisevic if he understood the form and instructed him to write down "[t]he amount that he was carrying" and to sign the form to indicate that "he understood what is on the form." Although the CBP form does not contain a signature line, Officer Zayas marked an "x" on the form

---

[1]This language tracks the CBP Currency Reporting form, on which both agents testified they relied in questioning Ibisevic. That form, CBP Publication No. 503, is available at http://www.cbp.gov/linkhandler/cgov/newsroom/publications/travel/currency_rpt_flyer/currency_reporting.ctt/currency_reporting.pdf (last visited Feb. 27, 2012).

indicating the place for Ibisevic's signature. Ibisevic wrote "5000" and signed his name.

Officers Zayas and Rodeheaver then placed the Ibisevices' carry-on bags on a table. Officer Zayas asked Ibisevic, "Where is the money?" In response, Ibisevic produced money from an envelope in his jacket pocket and from his wallet. Officer Zayas motioned to Ibisevic's bags on the table, looked at Ibisevic, and asked whether there was "any other money in the bags." After Ibisevic denied having other money in the bags, Officer Zayas searched Ibisevic's carry-on bags and found no additional currency. When Officer Zayas counted the money given to him from Ibisevic's pocket and wallet, it totaled $5,031.

During this time, Officer Rodeheaver inspected the carry-on bags belonging to Ibisevic's mother, Rahima. According to Officer Rodeheaver, he first examined a camera bag Rahima was carrying and found "a bank envelope" containing currency. Next, while searching Rahima's purse, he felt a "mass inside the bag" that he could not access. Ibisevic informed Officer Rodeheaver that the mass was sewn into the purse. Upon making these discoveries, Officer Rodeheaver asked Ibisevic, "How much currency are you traveling with?" and "How much money are we going to find?" According to Officer Rodeheaver, Ibisevic then became "a little flustered" and stated there was $10,000 in his mother's camera bag, $25,000 in her purse, and $5,000 on his person.

After the officers discovered the currency in Rahima's camera bag and purse, they escorted the Ibisiveces back to the main terminal of the airport. Officer Rodeheaver testified that the officers undertook "a full exam of all their luggage" and notified other personnel to "offload their luggage from the aircraft to see if there is [sic] any other prohibited items or contraband."[2]

---

[2]The Government has offered no evidence that the CBP officers found any currency in the Ibisevices' checked luggage.

Special Agent Julie Hilario of Immigration and Customs Enforcement then questioned Ibisevic. She testified that she met with him for approximately forty-five minutes. During that time, he waived his *Miranda* rights and spoke with her in English without the assistance of an interpreter. Ibisevic told Agent Hilario that all of the money was his. Like Officers Zayas and Rodeheaver, Agent Hilario testified that Ibisevic appeared to understand her questions and responded to them without hesitation and without need or request for a Bosnian interpreter.

The Government also called Chris Lowman to testify. Lowman described his role as a human resources manager of a large corporation that employed Ibisevic to assemble medical devices from 2005 to 2008. Lowman authenticated several documents from Ibisevic's employee file, including Ibisevic's resume and employment records, which indicate that Ibisevic's primary language is "Bosnian" and his secondary language is "English." Lowman also authenticated an employment comprehension test that Ibisevic had passed by answering thirteen of fourteen questions correctly. On cross-examination, Lowman conceded that he had no personal knowledge as to whether the comprehension test was given to Ibisevic in English or whether he responded in English. Lowman also acknowledged that an evaluation of Ibisevic in his personnel file stated that "[o]ther than language barrier, very good worker," and that another document in the personnel file stated that Ibisevic needed an English translator for written information. Finally, Lowman acknowledged that his corporation employed about one hundred Bosnians, some of whom "don't speak very much English" because their job did not require it.

Pursuant to an immunity agreement, Ibisevic's mother, Rahima, also testified during the Government's case. Rahima neither speaks nor understands English. Through a Bosnian interpreter, she testified that she was aware of the money in her bags and that all of the money belonged to her son. On

cross-examination, defense counsel attempted to question Rahima about what Ibisevic said to her after he signed the CBP form. As she started to explain, the district court *sua sponte* halted Rahima's testimony, characterized the answer she was about to give as hearsay, and called the lawyers to the bench.

During the bench conference, defense counsel proffered Rahima would testify that when customs officials asked the Ibisevices to step aside, Ibisevic told his mother in Bosnian, "They are asking me how much the checked luggage cost if it's lost." The defense argued that this statement constituted a present sense impression and so, even if hearsay, was admissible. The Government objected to the statement both on hearsay and relevancy grounds. The district court found the testimony "clearly relevant" but sustained the objection, ruling that it constituted hearsay and did not fall within the present sense impression exception to the hearsay rule. Accordingly, the jury never heard Rahima's testimony that, at the time of questioning by CBP agents, Ibisevic told her that the agents were simply inquiring as to what the checked luggage would cost if it were lost.

## B.

In the defense case, Ibisevic himself testified through a Bosnian interpreter that he was born and raised in Bosnia and legally entered the United States in 2000. He explained that when questioned at Dulles, he and his mother had been traveling for some time, having been delayed overnight in the Syracuse airport before arriving at Dulles. Ibisevic related that he had been unable to sleep because of a bad headache and because he was depressed due to his father's death. Although he had been steadily employed since coming to this country and became a United States citizen about two years prior to trial, Ibisevic maintained that he understood only basic English—that necessary for his job and everyday life. In response to questions, he acknowledged that he understood

the meaning of the word "money," but insisted he did not know the meaning of the word "currency."

Ibisevic testified that he was unaware of any reporting requirement and could not understand what Officer Zayas said to him or what the CBP form asked but, based on a friend's experience with lost checked luggage, he believed "it might be . . . they are asking about the value of the luggage." He signed the CBP form, "and then put on a number, what I thought would be a value proper to those checked bags." Ibisevic further testified that immediately after doing so, he told his mother that he "signed something, what I believe is for some insurance for our checked luggage. But now they are showing me to that table, so I probably need to be like checked out by these officers." He explained, "[t]he reason I told her this is because I was afraid if I go with the officer, she is going to continue to go to board the plane, and I had her boarding pass and I had her passport with me. . . . She doesn't speak English. She doesn't read or write English. I just wanted her to know she could remain with me."

According to Ibisevic, he only realized that the officers were inquiring about the amount of money he was carrying after Officer Zayas began to look in his wallet, at which point he immediately informed the officers that he was carrying $40,000. He explained, "If I had known, I would have admit to him immediately I had money with me. . . . Because it was my own money, and it is money what [sic] I borrowed from my sister."

In addition to Ibisevic, the defense called four witnesses, all of whom testified that Ibisevic's ability to speak or understand English was limited. A neighbor and former co-worker, Almir Beganovic, related that he needed to help Ibisevic communicate in English both at work and in his personal life. Safet Garibovic, who supervised Ibisevic when Ibisevic worked as a driver for Swift Transportation until shortly before trial, testified that Ibisevic's "English was really bad."

She explained that she spoke to Ibisevic in Bosnian and that he did not speak or write much English or understand written messages in English. She recalled instances in which she would have to call customers on Ibisevic's behalf. Ibisevic's sister, Fatima Velic, testified through a Bosnian interpreter that Ibisevic's English was "much worse" than her own; she also corroborated Ibisevic's testimony that she had given him $10,000 to take to Bosnia.

Robert Schaffer, a retired Professor of Education and Ibisevic's former English teacher, was the last defense witness. He testified that Ibisevic attended the professor's English classes for several months after Ibisevic came to the United States. Professor Schaffer explained that he saw Ibisevic socially in subsequent years and helped him communicate in English, including assisting him in the purchase of a home. Regarding Ibisevic's English proficiency, Professor Schaffer described it as "poor," and testified that over the years Ibisevic was "losing language rather than gaining language." Professor Schaffer also testified that Ibisevic had more difficulty understanding English spoken with an accent and was unlikely to comprehend new concepts that came from "out of the blue."

## C.

After a day-and-one-half of testimony, on the third morning of trial, the jury began deliberations. Approximately two hours later, the jury sent a note requesting "the legal definition of 'reasonable doubt.'" The district court, in accordance with our precedent, *see, e.g.*, *United States v. Walton*, 207 F.3d 694, 698 (4th Cir. 2000) (en banc), provided a proper instruction nearly identical to that given in the original jury instructions. Approximately four hours after beginning deliberations, the jury returned with a verdict of guilty on all three counts. The district court sentenced Ibisevic to two years of super-

vised probation and one hundred hours of community service and ordered that he forfeit $35,000 of the currency.[3]

Ibisevic moved for a new trial, arguing, *inter alia*, that the district court "inappropriately excluded" testimony "essential to the defense"—namely, the testimony of his mother, Rahima, that Ibisevic had told her immediately after signing the CBP form that the officers were asking the insurance value of the checked luggage. The district court denied the motion. *See United States v. Ibisevic*, 761 F. Supp. 2d 326 (E.D. Va. 2010).

The district court concluded it had erred in excluding Rahima's testimony, finding the excluded testimony was not hearsay and, in any event, "likely falls within the exception for present sense impressions." *Id.* at 341. However, the court found that exclusion of the testimony constituted harmless error because the proffered testimony "hardly stood alone on the issue of defendant's state of mind" and the Government presented "overwhelming" evidence of guilt. *Id.* at 342-43.

Ibisevic timely noted this appeal of the court's denial of his motion for a new trial.[4] We review that denial for abuse of discretion. *United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001).

II.

A.

The district court properly acknowledged that it erred in

---

[3]Upon finding "good cause" to believe $10,000 of the $35,000 belonged to Ibisevic's sister, Fatima, the district court ultimately amended the forfeiture order to only $25,000.

[4]Because we hold that the district court's exclusion of Rahima's testimony constitutes reversible error, we need not reach Ibisevic's other claims of error.

excluding Rahima's proffered testimony as to what Ibisevic told her immediately after signing the CBP form. *See Ibisevic*, 761 F. Supp. 2d at 341.

First, Ibisevic did not proffer the statement "to prove the truth of the matter asserted," *i.e.*, that he was actually being asked the value of his checked luggage. Rather, he offered it "merely to prove that [he] expressed [his] belief" that he was being asked about the value of his luggage. *See Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) (emphasis omitted). Accordingly, the statement was "direct evidence" of his "reaction[ ] and not hearsay." *See id.* (holding statements of children mistakenly calling a man in a purple reptilian costume "Barney" were improperly excluded as hearsay in trademark infringement suit); *see also United States v. Kohan*, 806 F.2d 18, 22 (2d Cir. 1986) (holding statements offered to prove "that they were made and that [defendant] believed them to be true" were not hearsay).

Second, even if the statement had been hearsay, it was admissible under the present sense impression exception to the hearsay rule. Ibisevic made the statement to his mother immediately after listening to and answering the CBP agents' questions. *See* Fed. R. Evid. 803(1) (rendering admissible a statement "describing or explaining an event or condition, made while or immediately after the declarant perceived it"); *see also Lyons*, 243 F.3d at 804.

Thus, the district court clearly erred in excluding Rahima's proffered testimony.

### B.

Of course, a finding of error does not end the matter. We must determine whether the error requires reversal or was harmless. To prove a nonconstitutional error, like this one, harmless, "the Government must demonstrate that the error did not have a 'substantial and injurious effect or influence in

determining the jury's verdict.'" *United States v. Curbelo*, 343 F.3d 273, 278 (4th Cir. 2003) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). An appellate court does not inquire into whether absent the error "sufficient evidence existed to convict," but rather whether "we believe it 'highly probable that the error did not affect the judgment.'" *United States v. Madden*, 38 F.3d 747, 753 (4th Cir. 1994). Thus, we must be able to "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Byers*, 649 F.3d 197, 211 (4th Cir. 2011) (quoting *Kotteakos*, 328 U.S. at 765).

We have identified three decisive factors in making this determination: "(1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case." *United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994). We consider each in turn.

1.

As to the first factor—the centrality of the issue affected by the error—the excluded testimony clearly did go to the central issue in the case, *i.e.*, Ibisevic's intent.

Because the Government had to prove that Ibisevic knowingly or intentionally evaded the reporting requirements and made a false statement, the issue of Ibisevic's intent was the central question in the case. As the prosecutor put it during closing argument, "Ultimately, this case is about lying." Indeed, Ibisevic's intent was the *only* disputed issue in the case. The parties agreed as to his conduct—that he attempted to board an international flight with over $40,000 without reporting that fact. Ibisevic's defense was that he could not have knowingly or intentionally committed the charged crimes because he did not understand the critical questions about "currency" put to him by the customs agents. Rahima's excluded testimony was the sole evidence that directly corrob-

orated Ibisevic's own testimony that he believed the customs agents were asking about the insurance value of his checked luggage (not the amount of currency in his carry-on bags) and thus had no knowledge of the currency reporting requirements, and so did not intend to violate them.

In maintaining that Rahima's testimony was not central to the defense, the Government relies on the district court's conclusion that, although "clearly relevant," Rahima's testimony was merely cumulative of other evidence indicating Ibisevic had difficulty understanding English. But that is simply not the case. The Government, as did the district court, conflates the purpose of Rahima's proffered testimony—to corroborate Ibisevic's testimony regarding his state of mind in response to the questions of the customs agents—with the more general inquiry as to Ibisevic's ability to understand English.

Certainly, Ibisevic had the opportunity to, and did, present witnesses attesting to the more general question. But the district court improperly excluded the only testimony corroborating Ibisevic's belief that Officer Zayas was asking about the value of his checked luggage, not the amount of money he was carrying. The jury could have credited the testimony of Ibisevic's witnesses that he generally had poor English skills yet discounted his stand-alone testimony that he misunderstood Officer Zayas in this particular matter. Because Rahima's excluded testimony was the *only* evidence that corroborated Ibisevic's claim that he believed he was truthfully answering questions as to the value of his checked luggage, her testimony was not cumulative.

The Fifth Circuit has held that the improper exclusion of testimony strikingly similar to that excluded here could not be discounted as cumulative or harmless. *United States v. Parry*, 649 F.2d 292, 296 (5th Cir. 1981). In *Parry*, as here, the district court *sua sponte* and erroneously excluded certain testimony as hearsay. There, as here, the excluded testimony was the only evidence that would have corroborated the defen-

dant's own testimony of assertedly innocent conduct. And there, as here, the excluded testimony came from the defendant's mother.

In *Parry*, the defendant testified that he thought he was working with law enforcement when he admittedly served as a middle-man in a drug sting, and, as in this case, he further testified that he discussed this belief with his mother. *Id.* at 294. The Fifth Circuit held that the district court's error in excluding the corroborating testimony of Parry's mother could not be ruled cumulative or harmless because although Parry's "farfetched" story had been "discounted by the jury when standing alone," that story "may have been believed when bolstered by his mother's testimony." *Id.* at 296. Similarly, while the jury may have found Ibisevic's contention that he misunderstood the currency questions to be "farfetched . . . when standing alone," the jury might have believed this contention "when bolstered by his mother's testimony." *Id.*;[5] *see also Kohan*, 806 F.2d at 22 (remanding for new trial when improperly excluded testimony "would have corroborated

---

[5]Tellingly, the Government does not assert that the Fifth Circuit incorrectly held the error in *Parry* was not harmless. Rather, the Government attempts to distinguish *Parry* on two grounds. Neither is persuasive. First, the Government contends Rahima's excluded testimony was merely cumulative while the testimony of Parry's mother was not. As explained above, this argument is meritless. Second, the Government maintains that this case is distinguishable from *Parry* because of the strength of its evidence against Ibisevic. It is not at all clear, however, that the evidence offered by the Government against Ibisevic was any stronger than that offered against Parry. For, the prosecution in *Parry* "elicited numerous statements [from] the DEA agents that Parry was not working for the government agents, did not believe that he was working for the agents, and did not know of the agents' true identities." 649 F.2d at 295. Indeed, the Fifth Circuit noted that "[t]he clear implication of the government's evidence and of its response to Parry's testimony was that Parry had fabricated his defense of lack of criminal intent." *Id.* at 295-96. Nevertheless, the court held the exclusion of the testimony of Parry's mother was not harmless because "the excluded testimony was the only available evidence that could corroborate Parry's story." *Id.* at 296.

[defendant's] statements to law enforcement officials, thereby helping to diminish the effect of their self-serving nature").

In sum, the first factor—the centrality of the issue affected by the error—provides no support for holding the error harmless. The issue affected by the error in excluding Rahima's testimony—whether Ibisevic understood the "currency question" and reporting requirements—clearly constitutes the central issue in this case.

2.

With respect to the second factor—mitigation efforts—the district court took no steps to mitigate the effects of the error. This is so because at trial the district court failed to acknowledge any existence of an error. *See United States v. Nyman*, 649 F.2d 208, 212 (4th Cir. 1980) (noting "no steps were taken to mitigate an error whose existence was not recognized").

This fact, of course, distinguishes this case from many in which we and other circuits have relied on mitigation efforts to find an error harmless. *See, e.g.*, *United States v. Thomas*, 664 F.3d 217, 224 (8th Cir. 2011) (holding harmless government's improper question of witness regarding whether she had been threatened before testifying when district court sustained defendant's objection to the question and instructed the jury to disregard the question); *United States v. Barraza*, 655 F.3d 375, 381 (5th Cir. 2011) (holding "extraneous information stated by a government witness" did not prejudice defendant when district court sustained defendant's objection to the testimony and "gave the jury a curative instruction, informing the jurors to disregard the testimony"); *United States v. Lighty*, 616 F.3d 321, 357 (4th Cir. 2010) (holding harmless improperly admitted prejudicial evidence, in part, because district court gave "explicit" curative instruction that the jury could not infer from the evidence the defendant's propensity to commit crimes).

Moreover, the nature of the excluded testimony—corroborating Ibisevic's stand-alone account of what he believed was occurring—may have aggravated the effects of the error in this case. For, "the jury may well have assumed that because [Ibisevic] did not ask his mother to confirm the existence of the critical conversation, the conversation probably never occurred." *Parry*, 649 F.2d at 296.

Accordingly, this factor too does not weigh in favor of finding the error harmless.

3.

The final factor—the closeness of the case—is "the single most important factor in a nonconstitutional harmless-error inquiry." *Ince*, 21 F.3d at 584 (internal quotation marks omitted).

In addition to pointing to the witnesses who testified on his behalf, Ibisevic argues that the jury's deliberations indicate that the jury in this particular case considered the case to be close. He points out that, even absent his mother's corroborating testimony, the jury deliberated for four hours on a single-issue case. Moreover, in the midst of those deliberations, the jury sent a note to the district court requesting a definition of "reasonable doubt," further suggesting that the jury did indeed experience difficulty in reaching a verdict. The Government assigns no significance to these facts. Indeed, the Government virtually ignores them—mentioning the four-hour jury deliberation only in passing and the jury's request for additional instruction not at all. The Government instead maintains that Rahima's excluded testimony could not have had a substantial effect on the outcome because Ibisevic's own testimony was not credible and because the Government put on "overwhelming" evidence of guilt.

a.

As to the first point, Ibisevic's credibility, the Government seizes on the district court's observation in denying the

motion for a new trial that the testimony from Ibisevic that Rahima would have corroborated was "actually undermined by the record as a whole." *Ibisevic*, 761 F. Supp. 2d at 343 n.73. The district court believed Ibisevic's testimony was not credible because the court found it "difficult to understand why defendant would state that his luggage was worth $5,000 given it contained over $30,000." *Id.* at 342.

The Government's reliance on the district court's "difficult[y]" is misplaced because that "difficult[y]" arose from a misunderstanding of the evidence at trial. What Ibisevic actually stated at trial, and what Rahima was prepared to corroborate, is that he answered "$5,000" because he believed he was being asked about the insurance value of his "checked luggage." The Government presented no evidence that the officers found any additional currency in the Ibisevices' *checked* luggage; rather, the Government found the additional money in *carry-on* bags. Thus, that Ibisevic valued his checked luggage at $5,000 is not in any way "undermined" by the fact that roughly $35,000 was found in the carry-on items that Ibisevic had not checked.

The Government also relies on the district court's observation in denying a new trial that Ibisevic's testimony lacked credibility because he "just happened to report a value for his luggage that was equivalent to the exact amount of currency he had on his person when he was being questioned." *Id.* at 342-43. This observation is accurate, albeit slightly exaggerated: the evidence showed that Ibisevic's asserted insurance claim ($5,000) was not "the exact amount" but slightly less than the $5,031 found on his person. But just as the jury may have concluded, as the district court did, that this circumstantial evidence cast doubt on Ibisevic's credibility, so it might have concluded (if permitted to do so) that Rahima's testimony had the opposite effect of "lend[ing] plausibility to an otherwise incredible yarn." *United States v. Lis*, 120 F.3d 28, 31 (4th Cir. 1997) (finding exclusion of evidence corroborat-

ing defendant's testimony was *not* harmless error); *see also Parry*, 649 F.2d at 296.

b.

As to the Government's second point, the asserted strength of its case, the Government contends, and the district court held in denying a new trial, that the prosecution presented "overwhelming" evidence "concerning the defendant's *mens rea—i.e.*, whether he understood the officers' questions." Appellee's Br. at 20. The Government points to the testimony of Officers Zayas and Rodeheaver and Agent Hilario that Ibisevic was able to "understand English and the instructions being given to him the day he was intercepted." *Id.* at 23.

We agree that the Government put on a good deal of evidence that Ibisevic could understand English. However, to convict him, the Government had to prove beyond a reasonable doubt that Ibisevic *actually* understood the questions put to him by the customs agents and so knowingly or intentionally committed the alleged crimes, not that he generally understood English well enough so that he *should* have understood those questions. As to Ibisevic's state of mind, the Government presented no direct evidence of his intent to commit the alleged acts. Nor did the Government offer any evidence as to why Ibisevic would intentionally evade the reporting requirements, given that he legally possessed the money and no law or regulation prohibited him from transporting it out of the country as long as he complied with those requirements.

Of course, we do not fault the Government for the circumstantial nature of its case; often there are precious few avenues for proving a criminal defendant's intent. For this reason, the Government can base its case on circumstantial evidence. *See United States v. Harvey*, 532 F.3d 326, 334 (4th Cir. 2008). The fact remains, however, that the Government was charged with proving Ibisevic acted knowingly or inten-

tionally when he failed to report accurately the amount of currency he was carrying. *See* 18 U.S.C. § 1001(a); 31 U.S.C. §§ 5316(a), 5324(c), 5332(a)(1). And, as we discussed above, Rahima's excluded testimony—directly corroborating Ibisevic's claim that he misunderstood Officer Zayas to be asking about the insurance value of his checked luggage—went to the heart of that inquiry. Had the jury heard and credited Rahima's testimony, the Government would have had a harder case to make. *See Lis*, 120 F.3d at 31 (noting that if improperly-excluded corroborating evidence "[was] believed, the government [would be] left without a 'smoking gun,' and its circumstantial case becomes significantly weaker").

Moreover, the strength of the Government's case does not, in itself, resolve the "closeness" question. The closeness inquiry "involves assessing whether the . . . evidence is not only sufficient to convict, but whether it is sufficiently powerful in relation" to the excluded testimony to ensure the error did not affect the outcome. *Ince*, 21 F.3d at 584.

For example, in *United States v. Nyman*, 649 F.2d 208 (4th Cir. 1980), the Government presented strong direct evidence of guilt: five eye-witnesses identified the defendant as the person responsible for the criminal acts. *Id.* at 209-10. But weighing that evidence in relation to the excluded evidence—the testimony of a law student assisting the defense that two of these eye-witnesses failed to recognize the defendant on the morning of trial—we held that the improper exclusion was not harmless. *Id.* at 212.

We did not ground our holding in *Nyman* on our own assessment that the evidence offered by the Government was insufficient to sustain the conviction. Nor did we conclude, or even suggest, that the Government's evidence was not significantly stronger than the defense evidence that had been improperly excluded. Rather, despite the strength of the Government's evidence we noted that the jury's five-hour deliberation in a "narrow, single-issue case" indicated that the jury

that heard the evidence apparently found the case a close one. 649 F.2d at 212. For this reason, we held the erroneous exclusion of defense evidence could not be found harmless, explaining that the judgment of "this particular jury in the particular circumstances of this trial" may "well have been swayed by the excluded testimony." *Id.*

Here, too, the Government's argument that the asserted strength of its case compels a finding that the case was not a close one runs headlong into the inescapable conclusion that the particular jury that heard the evidence apparently did regard the case as close. For the jury deliberated for four hours in a "narrow, single-issue case," *id.*, and requested an additional instruction before rendering a verdict. Regardless of "whether we—reading a cold appellate record—would consider the question of guilt a close one," *id.*, we simply cannot ignore these facts. Under these circumstances, Rahima's "clearly relevant" excluded testimony "could have been of decisive importance in tipping the balance," *id.*, as it would have been the only corroborating evidence going to the central and only contested issue in the case—Ibisevic's intent. In short, the Government has failed to demonstrate that the alleged strength of its circumstantial case and assertedly incredible nature of Ibisevic's testimony compel a finding that the case was not close in the view of "this particular jury in the particular circumstances of this trial." *Id*.

Accordingly, the final and most important factor—the closeness of the case—also does not weigh in favor of finding the error harmless.

\* \* \*

In sum, given the centrality of the issue affected by the excluded testimony, the absence of any mitigation (and possible aggravation) of the error's effects, and what we can only perceive as the relative closeness of the case in view of "this particular jury," *id.*, we "cannot say, with fair assurance, . . .

that the judgment was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 765. Accordingly, we must vacate the judgment of the district court, and remand the case for further proceedings consistent with this opinion.

## III.

For the reasons set forth above, we vacate the judgment of the district court and remand the case for further proceedings consistent with this opinion.

*VACATED AND REMANDED*