**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 21-4447**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

   v.

JONATHAN LYNN JENKINS, a/k/a Max,

        Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever, III, District Judge.  (5:18-cr-00451-D-1)

Argued:  September 19, 2023                       Decided:  November 26, 2024

Before DIAZ, Chief Judge, and WILKINSON and BENJAMIN, Circuit Judges.

Affirmed by unpublished opinion.  Judge Benjamin wrote the opinion, in which Chief Judge Diaz and Judge Wilkinson joined.

**ARGUED:**  Joseph Bart Gilbert, TARLTON LAW PLLC, Raleigh, North Carolina, for Appellant.  Lucy Partain Brown, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:**  Michael F. Easley, Jr., United States Attorney, David A. Bragdon, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DEANDREA GIST BENJAMIN, Circuit Judge:

Jonathan Jenkins appeals the district court's denial of his motion to suppress a video confession he claims violated Fed. R. Evid. 410 and Fed. R. Crim. P. 11(f), the denial of his motion to exclude expert testimony about sex trafficking in violation of Fed. R. Evid. 403, and the reasonableness of his sentence. Finding no reversible error, we affirm.

## I.

A federal grand jury indicted Jenkins on charges of conspiracy to commit sex trafficking by force, fraud, and coercion and of a minor, in violation of 18 U.S.C. §§ 1591(a), (b)(2) and 1594(c) (Count One); sex trafficking by force, fraud, and coercion of a minor and aiding and abetting, in violation of 18 U.S.C. §§ 1591(a), (b), and 2 (Count Two); sex trafficking of a minor and aiding and abetting, in violation of 18 U.S.C. §§ 1591(a), (b)(2), and 2 (Count Three); use of the internet to promote an unlawful business enterprise and aiding and abetting, in violation of 18 U.S.C. §§ 1592(a)(3) and 2 (Count Four); and possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Count Five). Jenkins' nephew and codefendant, Antoine Lamar Wallace, was also charged in Counts One through Four. The Government alleged Jenkins and Wallace sex trafficked young women and girls. Jenkins pled not guilty. Wallace, however, pled guilty to sex trafficking and testified at trial against Jenkins.

Prior to trial, Jenkins moved to suppress "statements" he contended were protected plea discussions under Fed. R. Evid. 410 and Fed. R. Crim. P. 11(f), but which the Government characterized as a voluntary confession. The district court denied Jenkins'

2

motion.  As a result, at trial the Government introduced into evidence a two-hour videotape where Jenkins allegedly admitted to the charged conduct.

Prior to trial, Jenkins also moved to exclude, under Fed. R. Evid. 403, 702, and 703, the Government's proposed expert witness, Dr. Sharon Cooper, a forensic and developmental behavioral pediatrician.  The court likewise denied that motion, and Dr. Cooper testified at trial.

After a week-long trial, a jury convicted Jenkins on all counts.  The district court sentenced Jenkins to life on Counts One, Two, and Three, to be served consecutively; 60 months' imprisonment on Count Four, to be served concurrently to Counts One, Two, and Three; 120 months' imprisonment on Count Five, to be served concurrently to Count Four; and 5 years supervised release on Counts One, Two, and Three and 3 years supervised release on Counts 4 and 5, all to run concurrently.  After the district court entered an amended judgment on August 11, 2022, Jenkins timely appealed.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

II.

Jenkins contends that admission of the videotape violated Fed. R. Evid. 410 and Fed. R. Crim. P. 11(f) and denied him a fair trial.  Assuming without finding the district court erred in admitting the videotape, the error was harmless.  The evidence the Government put forth to establish Jenkins' guilt was extensive and compelling.  We repeat much, though not all, of it here.  The following is based on testimony from Jenkins' victims, Wallace, and law enforcement.

3

A.

Wallace began pimping in the fall of 2014.  Wallace was inexperienced, however, and enlisted Jenkins—fresh out of jail for second degree murder—for help.  The sex trafficking conspiracy involved five main prostitutes/victims, though others came and went.  Two were 17 years old. [1]  The operation lasted almost a year.

Jenkins initiated victims into his sex trafficking conspiracy with a "test."  This meant forced sex with him and his nephew.  Working hours were "[a]ll day, every day." *E.g.*, J.A. 345, 369, 561.  If a victim was menstruating, Jenkins had her "stick a makeup sponge up there" and keep working.  J.A. 345.  Jenkins set the rules and prices for "dates," served as "security," and took all money for himself and his nephew.  J.A. 344–45, 672.

Jenkins required his victims "to be the perfect bitch."  J.A. 370.  This meant calling Wallace "Daddy," cleaning his house, and taking care of his children.  J.A. 369–70, 761.  It also meant, when in public, walking only at Wallace's sides and opening all doors before he could touch them.  The punishment for disobedience was being choked out, punched in the chest, "or whatever type of punishment they felt was feasible at the moment."  J.A. 370.

Jenkins marketed the victims on Backpage, a classifieds website used mainly for finding prostitutes.  Though sometimes the victims assisted him, Jenkins wrote and posted the ads himself.

---

[1] J.R. (nickname "Jazzy") and B.H. (nickname "Princess") were seventeen years old.  The jury did not find, however, that Jenkins acted "knowing or in reckless disregard of the fact . . . that [Princess] had not attained the age of 18."  Appellee Br. at 12.

4

Prostitution took place at a several locations, including hotels and, later, an unfurnished duplex Jenkins and Wallace rented. Victims initially slept on the floor. Jenkins and Wallace later bought them air mattresses to see clients and sleep on. Jenkins also lived with the victims and had sex with them when he felt like it.

Jenkins blew hot and cold to control his victims.[2] Upon joining, Jenkins treated his victims with care, or even romantically, buying clothes or telling them they were pretty. But he also physically controlled them. Jenkins dictated the sex acts the victims offered. This included anal sex, which he taught and tried out with them first. The victims also had to ask Jenkins for food, transportation, and hygiene items, including condoms. Wallace, for his part, made victim B.H. tattoo herself with his initials in an infinity symbol.

As the "security" or "enforcer" of the group, Jenkins hit, punched, choked, or threatened the victims. For example, B.H. saw Jenkins choke out victim J.R. "until her eyes rolled to the back of her head." J.A. 404. Victim M.J. heard Jenkins "beat [victim A.H.] and water board[] [her] baby" while A.H. screamed "get off me" and her baby cried. When A.H. returned, her face was swollen, bruised, and teary. Her son was red-faced and crying. J.A. 495–96. Likewise, after A.H. called Wallace by name instead of "Daddy," Jenkins "with a backhand, with a fist[,] struck her in the face . . . and then just kept striking her in the shoulder and the chest area" as A.H. screamed and Wallace's son looked on. J.A. 729.

---

[2] This practice of luring victims with romance and alternating affection and violence is common and well-documented. *See* Michael J. Frank & G. Zachary Terwilliger, *Gang-Controlled Sex Trafficking*, 3 VA. J. CRIM. L. 342, 376-382 (2015).

Jenkins made it known he carried a gun. J.A. 388. Jenkins and Wallace also had gang ties and made sure the victims knew it. The victims knew that if they "ever left" Wallace, he would "try to get [them] found." J.A. 573–74, 706.

Jenkins claimed spiritual powers over his victims. He professed to the victims that they were his servants, and he and Wallace gods. Jenkins performed ritual sex acts on his victims and claimed he could read their thoughts. Jenkins blamed a spirit that inhabited him, "Obed," for the violence he inflicted on the victims. J.A. 398, 770. Once, Jenkins choked B.H. and J.R. to the point of unconsciousness. Regarding J.R., he choked her with such force that her feet left the ground. J.A. 408–09, 605–06. Jenkins then made a "circle around [B.H. and J.R.], talking in his real crazy language," before telling the girls that if either stepped outside the circle, she would die. J.A. 409, 606, 773.

The Government also introduced a voluminous amount of text messages Jenkins sent to his victims and nephew. B.H. testified about texts relating to arranging dates. J.A. 354–55. In one message, Jenkins stated that B.H. should tell her client that if he "Fs up my S," Jenkins would "slit his throat." J.A. 356. In other messages, Jenkins directed B.H. to post ads on Backpage advertising "blow job[s]." J.A. 356–57. B.H. also testified about specific text messages where Jenkins and "Obed" threatened her for actions Jenkins felt were out of line with "the universe" Jenkins conceived himself god of. J.A. 393.

J.R. testified to texts with Jenkins about being required to work non-stop and taking prostitution calls "at 2:00 o'clock in the morning." J.A. 559–60. J.R. also testified to text messages where Jenkins called her "[m]y beautiful wife" and her belief that Jenkins would marry her one day. J.A. 564.

6

R.H. testified that even after leaving the prostitution ring, Jenkins texted her. Jenkins believed R.H. was "stealing" clients and Jenkins implied he was going to visit her aunt's house "to come find [R.H.]." J.A. 681–82. When R.H told him not to "go to my people's house," Jenkins responded that he "was under the impression that you wanted to see us, seeing that you reached out to our clientele. But I'm more than willing to put petty difference to the side if you remove the lies ASAP." J.A. 682. R.H. testified this message scared her and that this was when Jenkins posted "a picture of me giving oral sex on my Facebook." J.A. 682–83. Further, after R.H. denied taking clients and told Jenkins to "please not call my phone anymore," he responded "[w]e have no problem coming wherever you are." J.A. 693.

Wallace also testified about his text messages with Jenkins. Wallace confirmed he and Jenkins communicated via text message "during the time that [they] worked together" and that Exhibits 56A through 56I—which were entered into evidence—were the messages in question. J.A. 739–40. Some of Wallace and Jenkins' texts document prostitution dates while others comment on certain victims' physical appearances. Others discuss Jenkins' threats to victims who attempted to leave the group or Jenkins' requirements that the victims "clean [Wallace's] house." J.A. 752, 759. The Government showed Wallace one of Jenkins' texts where he stated that "[t]heir job is to lay there and take it," to which Wallace testified that Jenkins believed the victims "had to do what he asked of them sexually." J.A. 761.

Over time, and under harrowing circumstances, each victim except J.R. left the group. Leaving, however, did not mean being "out." For example, as noted above, after

7

R.H. left, Jenkins sent her "threat[ening]" text messages and publicly posted a picture of her performing oral sex on her social media. J.A. 683–84, 754. And after B.H. escaped with the help of her most loyal client, Jenkins went to the client's home and shot at him.

In mid-January 2016, local law enforcement arrested Jenkins and his nephew and searched the duplex. Among other things, law enforcement found a shotgun Jenkins had brought into the house that morning, a "private dance pole kit," the book *Pimpology*, A.H.'s family photo and ultrasound image, a shopping list of menstrual products, and paperwork in Jenkins' name. Jenkins was charged with state crimes, and later the federal crimes here.

## B.

"When reviewing the denial of a motion to suppress, [the Court] review[s] the factual findings for clear error and the district court's legal determinations de novo." *United States v. Elsheikh*, 103 F.4th 1006, 1013 (4th Cir. 2024) (quoting *United States v. Khweis*, 971 F.3d 453, 459 (4th Cir. 2020)). A district court's admission of evidence is reviewed for abuse of discretion. *Id.*

Both Fed. R. Crim. P. 11 and Fed. R. Evid. 410 bar admission of "a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea." Fed. R. Evid. 410(a)(4); Fed. R. Crim. P. 11(f); (incorporating by reference Fed. R. Crim. P. 410). "Because Rule 410 is an exception to the general principle that all relevant evidence is admissible at trial, 'its limitations are to be construed narrowly.' " *United States v. Stevens*, 455 F. App'x 343, 345 (4th Cir. 2011) (No. 11-4019) (citing *United States v. Roberts*, 660

8

F.3d 149, 157–58 (2d Cir. 2011)).  To make its assessment, courts assess whether "the defendant exhibits a subjective belief that he is negotiating a plea, and that belief is reasonable under the circumstances." *United States v. Cowan*, 96 F.3d 1439 (4th Cir. 1996) (table); *United States v. Robertson*, 582 F.3d 1356, 1366 (5th Cir. 1978) (en banc). Statements voluntarily made "after a plea agreement has been reached cannot be considered statements made 'in the course of plea discussions' within the meaning of the exclusionary rule[]." *E.g.*, *United States v. Hare*, 49 F.3d 447, 450 (8th Cir. 1995).

Here, after his initial appearance, Jenkins asked to speak to the assistant district attorney without his lawyer.  The assistant district attorney obliged and, along with a local detective, met Jenkins and filmed the encounter.  In Jenkins' view, these discussions were inadmissible under Rule 410 because they were negotiations that never resulted in a plea bargain—this despite the fact Jenkins appears to have first waived his rights under the Fourth and Sixth Amendments and later made incriminating statements.  Jenkins contends admission of the videotape was prejudicial because the Government mentioned it at trial and played audio clips from it in its closing arguments.  Jenkins asserts the videotape's admission substantially swayed the jury and that he is entitled to a new trial.  The Government disagrees and contends Jenkins reached a plea bargain with the assistant district attorney, rendering the videotape's admission proper.

We need not decide whether the above discussions bore a plea bargain or stalled at negotiation.  Assuming without finding Rule 410 was violated, any error admitting the videotape was harmless.

9

"To prove a nonconstitutional error harmless, . . . 'the Government must demonstrate that the error did not have a 'substantial and injurious effect or influence in determining the jury's verdict.' " *United States v. Ibisevic*, 675 F.3d 342, 349–50 (4th Cir. 2012) (quoting *United States v. Curbelo*, 343 F.3d 273, 278 (4th Cir.2003)). An appellate court does not inquire into whether absent the error "sufficient evidence existed to convict," but whether "we believe it 'highly probable that the error did not affect the judgment.' " *United States v. Madden*, 38 F.3d 747, 753 (4th Cir. 1994) (quoting R. Traynor, *The Riddle of Harmless Error* 34–35 (1976)). Thus, we must be able to "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Byers,* 649 F.3d 197, 211 (4th Cir. 2011) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765 (1946)). We have identified three factors in making this determination: "(1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case." *United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994).

Factors 1 and 2 favor Jenkins. The videotape concerned Jenkins' guilt and the charged conduct. And because the district court admitted the videotape, it did not "mitigate" any error. *See United States v. Nyman*, 649 F.2d 208, 212 (4th Cir. 1980) (noting "no steps were taken to mitigate an error whose existence was not recognized"). But the "single most important factor in a nonconstitutional harmless-error inquiry," the closeness of the case, does not favor Jenkins. *See Ibisevic*, 675 F.3d at 353 (quoting *Ince*, 21 F.3d at 584). In fact, this last factor sinks his case.

10

Given the evidence admitted at trial, only some of which we have described above, we can say with fair assurance, and without stripping the erroneous action from the whole, that the jury's verdict was not substantially swayed by the error. *See id.* at 350. The evidence at trial was one-sided. Law enforcement, Jenkins' victims, and his coconspirator and nephew Wallace testified against him. The evidence established the sex trafficking conspiracy Jenkins ran with Wallace, Jenkins' possession of a firearm, and the violence he inflicted on his victims. Jenkins' response was weak. Jenkins called an investigator and a few law enforcement witnesses who, he argues, showed certain victims gave prior inconsistent statements. The jury saw the videotape only after the victims gave their testimony and Wallace had taken the stand. In context, admission of the videotape was cumulative, and we do not believe the jury was substantially swayed by it. *Cf. United States v. Williams*, 61 F. App'x 847, 849 (4th Cir. 2003) (No. 02-4432(L)) (holding that because codefendant "clearly implicated" appellant in charged conduct, any error in admitting appellant's involuntary statements was harmless); *United States v. Patterson*, 150 F.3d 382, 386 (4th Cir. 1998) (noting "the testimony of a co-defendant standing alone and uncorroborated is sufficient to sustain a conviction").

Accordingly, we affirm the district court's denial of the motion to suppress.

## III.

Next, we turn to Jenkins' claim that the district court abused its discretion by admitting Dr. Cooper's testimony, which Jenkins argues went beyond the facts of his case. "We review a district court's decision to qualify an expert witness, as well as the admission

11

of such testimony, for abuse of discretion." *United States v. Garcia*, 752 F.3d 382, 390 (4th Cir. 2014). "A court abuses its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding." *Id.* (internal quotation marks omitted).

> Under Fed. R. Evid. 702:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

A district court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)) (internal quotation marks omitted). "[A]n expert's testimony is relevant if it has a valid scientific connection to the pertinent inquiry," and it is reliable if it is "based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Id.* (cleaned up).

"We apply a 'highly deferential' standard of review . . . and a trial court's 'decision to admit evidence over a Rule 403 objection will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused.'" *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) (quoting *United States v. Udeozor*, 515 F.3d 260, 265 (4th Cir. 2008)). "We have emphasized that relevant evidence should only

12

be excluded under Rule 403 'when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence.' " *Id.* (quoting *United States v. Siegel,* 536 F.3d 306, 319 (4th Cir. 2008)).

We reject Jenkins' challenge that Dr. Cooper's testimony violated Rule 403. The district court properly allowed Dr. Cooper to testify broadly about the "typical human trafficking experiences of its victims and the common behaviors of traffickers." *United States v. Warren*, 774 F. App'x 778, 782 (4th Cir. 2019) (No. 18-4562). Prior to testifying, the Government had called Jenkins' victims, who spoke about how they were recruited, their relationships with Jenkins and Wallace, Jenkins' and Wallace's requirements, and the violence encountered while in the group. Much of Dr. Cooper's testimony related directly to this evidence and gave it context, which was important because the culture and dynamics of sex trafficking are "not the subject of common knowledge." *United States v. Taylor*, 239 F.3d 994, 998 (9th Cir. 2001). For these reasons, we have previously permitted "broad[]" expert testimony about the "typical human trafficking experiences of its victims and the common behaviors of traffickers" to "give context to the victim's testimony." *Warren*, 774 F. App'x at 782. Such testimony "aid[s] the jury in better understanding some of the concepts and events described by the victim and in assessing the victim's credibility." *Id.* Without it, "the jury would have no way of determining whether the victim's experiences were common, unique, or implausible." *Id.*

Other circuits have held the same and affirmed the use of experts, including Dr. Cooper. *See, e.g.*, *United States v. Marshall*, 946 F.3d 591, 596–97 (D.C. Cir. 2020)

13

(noting Dr. Cooper's extraordinary qualifications and holding that counsel was not ineffective by only partially challenging her testimony); *United States v. Carson*, 870 F.3d 584, 590–91 (7th Cir. 2017) (describing how Dr. Cooper helped the jury understand sex trafficking).  Just last year, we affirmed the district court's decision to permit Dr. Cooper's testimony in a sex trafficking case, noting "the weight of authority supports [this] position" and citing many cases "in which courts have upheld the admission of expert testimony on the culture of sex trafficking and the psychology behind it."  *United States v. Jennings*, 860 F. App'x 287, 288–89 (4th Cir. 2021) (No. 20-4432) (collecting cases).

At bottom, the district court carefully balanced the probative value of Dr. Cooper's testimony against the potential for unfair prejudice and correctly found that the challenged testimony was relevant and admissible, and that the probative value of the testimony was not substantially outweighed by unfair prejudice.  Therefore, we affirm admission of Dr. Cooper's testimony.

## IV.

Finally, Jenkins contends his sentence is unreasonable.

We review a defendant's sentence "under a deferential abuse-of-discretion standard."  *Gall v. United States*, 552 U.S. 38, 41 (2007).  Under the *Gall* standard, a sentence is reviewed for both procedural and substantive reasonableness.  *Id.* at 51.  In determining procedural reasonableness, we consider whether the district court properly calculated the defendant's advisory Sentencing Guidelines range, let the parties argue for an appropriate sentence, considered the 18 U.S.C. § 3553(a) factors, and sufficiently

14

explained the selected sentence. *Id.* at 49–51. If a sentence is free of "significant procedural error," then we review it for substantive reasonableness, "tak[ing] into account the totality of the circumstances." *Id.* at 51. We apply "a presumption of reasonableness to a sentence within or below a properly calculated [G]uidelines range." *United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017) (internal quotation marks omitted). This "presumption can only be rebutted by showing that the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a) factors." *Id.* at 357–58 (internal quotation marks omitted).

Jenkins contends his sentence is procedurally unreasonable because the district court's explanation for it is inadequate. Jenkins argues the district court (1) did not explain how the § 3553(a) factors shaped its sentencing decision; (2) did not articulate why Jenkins was immune to other means of deterrence; and (3) did not engage counsel about the merits of Jenkins' arguments. Jenkins contends his sentence is substantively unreasonable because of his age at sentencing (48 years old), his efforts to rehabilitate himself through education, and the disparity between his life sentences and Wallace's 156-month sentence.

Before the district court, Jenkins argued that he had been abused as a child, that despite this abuse he had graduated high school, went to college, and briefly played professional football. Jenkins then mentioned that after getting out of prison for second-degree murder, he took a few community college classes about electrical work. Jenkins concluded that given the above, a sentence below the bottom of the Guidelines range was appropriate. When pressed "Why?", Jenkins' counsel reiterated, "Again, abuse in the home growing up; an attempt to better himself through education and schooling to get out

15

of that impoverished, abusive upbringing. . . . Those are the ultimate points we make for a sentence below 210 months." J.A. 1386.

We reject Jenkins' argument that his sentence was procedurally unreasonable. Jenkins' arguments at sentencing were cursory. Even so, the district court considered them and rejected the contention Jenkins was entitled to a downward variance for "[attending college and playing football] when you were in your twenties" when "[a]ll of the events that I'm here to sentence you for today took place after you had served a serious sentence in state prison." J.A. 1397–98. In context, nothing more than this brief explanation was required. *See United States v. Blue*, 877 F.3d 513, 518 (4th Cir. 2017). Jenkins' contention that the district court did not address the § 3553(a) factors is equally spurious—the sentencing hearing transcript shows the opposite.

Last, we find that Jenkins' sentence was substantively reasonable. Jenkins total earned offense level was 51. Because 43 is the maximum level a defendant can score, Jenkins' level was adjusted down to 43, still resulting in a guidelines range of life. As noted before, the district court addressed the § 3553(a) factors on the record to justify its sentence, emphasizing the offense conduct and Jenkins' history and characteristics. Jenkins' sentence, which was within his guidelines' range, was not substantively unreasonable. *See Vinson*, 852 F.3d at 357.

Put simply, the offense conduct here was abhorrent. Jenkins sold girls' and young women's bodies for personal gain and physically abused them in the process. Jenkins' contention that there is an unwarranted disparity between his sentence and Wallace's is baffling. Where Wallace had no prior felony convictions, Jenkins had recently been

16

released from serving a sentence for murder.  And unlike Jenkins, Wallace pled guilty, accepted responsibility, and cooperated with the Government, testifying against Jenkins. The contrast between Jenkins' and Wallace's sentence is not arbitrary.  So, we affirm Jenkins' sentence.

## V.

The Government's evidence against Jenkins at trial was overwhelming and one-sided.  The sentence the district court imposed on Jenkins was severe, but well-earned.  The jury conviction and judgment of the district court is

*AFFIRMED.*

17